STATE OF NEBRASKA, APPELLEE, V. FRANCES L. THOMPSON, APPELLANT.
507 N.W.2d 253

Filed October 22, 1993.   No. S-92-891.

Andrew Reid and Bruce Ellison for appellant.

Don Stenberg, Attorney General, and Marilyn B. Hutchinson for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, SHANAHAN, FAHRNBRUCH, and LANPHIER, JJ., and RONIN, D.J., Retired.

FAHRNBRUCH, J.

Frances L. Thompson appeals her jury convictions for first degree murder and for use of a firearm to commit a felony in the August 18, 1991, killing of Dean Frank. Thompson admits she shot and killed Frank, but claims the killing was done in self-defense. We affirm the jury's verdicts.

## STANDARD OF REVIEW

In reviewing a criminal conviction, it is not the province of an appellate court to resolve conflicts in the evidence, pass on the credibility of witnesses, determine the plausibility of explanations, or weigh the evidence. Such matters are for the trier of fact, and the verdict of the jury must be sustained if, taking the view most favorable to the State, there is sufficient evidence to support it. *State v. Russell*, 243 Neb. 106, 497 N.W.2d 393 (1993); *State v. Bronson*, 242 Neb. 931, 496 N.W.2d 882 (1993).

## FACTS

Viewed most favorably to the State, the facts of this case are as follows:

At the time Frances L. Thompson killed Dean Frank on August 18, 1991, she was a 41-year-old widow. She had just completed her third year of full-time study at the University of Nebraska at Lincoln, where she had been almost a straight-A student. Thompson hoped eventually to attend law school and pursue a career in environmental law.

During her attendance at the university, Thompson maintained an apartment in Lincoln. When not at the university, she resided in rural Knox County on an 850-acre farm near Verdigre, Nebraska. The farm was owned by Thompson's mother, and Thompson hoped to inherit the farm someday. At the time Frank was killed, Thompson's 22-year-old

son, Steven, was stationed in Great Lakes, Illinois, with the U.S. Navy.

Thompson met Frank shortly after moving onto the Knox County farm in 1985. Frank did odd jobs around the farm and was paid by Thompson's mother. Frank also helped Thompson with various tasks such as moving heavy objects and helping to care for her pet pig. In exchange, Thompson did mending and typing for Frank.

Frank lived in Atkinson, Nebraska, and early in their relationship, Thompson and Frank saw each other infrequently. Thompson described her relationship with Frank as one of friendship. She testified that Frank was a "perfect gentleman" to her during the 6 years preceding the killing. She had rebuffed his one "pass" at her soon after they became acquainted. Frank sometimes spent the night at Thompson's house when he did jobs for her that required more than 1 day to complete. He slept in a spare upstairs bedroom.

The nature of the relationship between Thompson and Frank changed dramatically during the summer of 1991. On June 16, 1991, Thompson spent the night at Frank's trailer. According to Thompson's testimony, Frank suggested that night in a "business like way" that the two marry and that he take over the running of Thompson's farm so they could pursue organic farming. Thompson was interested in working her mother's farm rather than leasing it out, but had no farming skills, and Frank was a farmer without a farm.

Thompson denied that she was interested in marriage or sex with Frank. Nonetheless, Thompson and Frank apparently contemplated a sexual relationship of some sort. On Tuesday, June 25, Thompson wrote Frank, informing him that the cost of a Certificate of Sexual Health from the University Health Center would be about $103.28 and that "this project" could cost him over $200. In that letter, Thompson stated:

> Whew! I was hopin' to do this all w/ blood outta my arm, but they INSIST they have to make ya take yer clothes off & spread yer legs. AAUUGGGHH!!!
>
> Makes me SICK! I'm tellin' ya, if I do this YOU'RE gonna do it, TOO. Ick, ick, ICK!! (*I know, that was the idea, to make you do it, too.* But I mean YOU hafta take

all the same tests I do!!)
(Emphasis supplied.)

Thompson questioned whether Frank might rather keep his freedom after having time to reconsider. Continuing the letter the following day, she stated:

> I just reread what I wrote yesterday, and I bet I know how you're reacting to it.
>
> Betcha you're thinking something paranoid like, "Gee, sounds like she wants to back out." Uh-uh, dammit. I am quite nicely giving you every opportunity to back out.
>
> . . . [*Y*]*ou don't have to look for double meanings in what I write.*

(Second emphasis supplied.)

Nonetheless, Thompson explained at trial what she really was trying to tell Frank:

> I was trying to give him a chance to back out, *hoping he would take it, because I didn't want to get married.* I didn't want to get involved in any sexual relationship.
>
> . . . .
>
> . . . *I didn't want him to think, and figure out what I was really thinking. I didn't want him to know, and I had never told him, that I just wasn't interested in him sexually.* I did come out and tell him that I was giving him an opportunity to back out, but I didn't tell him why I wanted him to take it.

(Emphasis supplied.)

Thompson informed Frank in the letter that she had changed her mind about going to summer school all summer and had dropped two classes so that she would be at home from mid-July to late August. She invited him to join her in Lincoln for the Fourth of July.

On July 3 or 4, 1991, Frank went to Lincoln and stayed with Thompson at her duplex until July 9, when both Frank and Thompson left Lincoln and went to Verdigre. That same day, the two went to a physician in Verdigre and had blood tests done for acquired immune deficiency syndrome and syphilis. At trial, Thompson described this as a "first step" in considering a serious relationship with Frank. Thompson was concerned

about sexually transmitted disease because she knew that Frank had engaged in sexual activity with other women.

Thompson called the physician's office for the results of the tests, which were negative, and drove to Atkinson to give Frank the results. Thompson testified that she was in Atkinson from July 12 through July 15 and that she stayed at Frank's trailer while she was there.

On Tuesday, July 16, Thompson started a letter to Frank inviting him to accompany her to Chicago for her son's graduation from basic training. She wrote, "I KNOW you don't particularly want to see Kid graduate. But, think about it! YES, you do! If he DOES graduate, he'll LEAVE ME ALONE for 4 WHOLE YEARS. You'll be so HAPPY FOR ME!!" She also wrote, "I put WAY too much energy into agonizing over letting sex back into my life. Guess it ain't for you - but for ME it was the biggest change in lifestyle imaginable."

Thompson told Frank she had "something a little more fun" to write about, but that it was "too personal to put in a letter." She informed Frank that she had learned about something that "could be called Selfish Sex" at a California sex clinic and that she thought it was "neat." She promised to tell Frank all about it on Saturday, presumably July 20. Thompson signed the letter "Huggs & . . . stuff."

Thompson was in Atkinson again on July 22. Around this time, Thompson told Frank she wanted to meet his ex-wife and his children. According to Thompson, Frank became "very angry and upset" at this request and said he did not want Thompson meeting them, which made her suspicious.

Thompson also testified that Frank began throwing out strange comments about other women. She believed he was trying to bait her into being jealous because she was not reacting to him sexually as he wanted her to. Thompson responded by writing two versions of a letter to Frank, apparently on July 22. She left one version of the letter at Frank's trailer, where it was found after Frank's death. The other version was found at Thompson's farmhouse. In the version left at Frank's trailer, Thompson accused Frank of "jacking w/ [her]," bringing up issues that raised questions in her mind, and refusing to answer her questions in regard to other women.

In the letter, Thompson referred several times to her "jealousy" and informed Frank that his behavior hurt her and "goad[ed her] into <u>more</u> jealousy." Nonetheless, Thompson testified that she was not at all jealous of Frank because she did not want him and did not care who did. She claimed that she was "guilty of playing a game" with Frank when she said she was jealous, in the hope that by "feeding his ego," "head-patting," and "suck[ing]-up," he would be "complimented" and would "straighten up and be more honest" with her. Thompson further testified that she "was using the word jealousy for the word disgust. But telling somebody you're disgusted with them really doesn't get you anywhere, and [she] was hoping the word jealousy would."

Thompson wrote Frank that he had "slapped [her] up side the head w/ another woman" and then refused to answer her questions about the other woman and that "nothing could be more viciously calculated" to make her worry. Later in the letter, Thompson alluded to yet another woman Frank had apparently mentioned:

> And that remark last night about some woman's "stuff all over." <u>That</u> was doing it again, too. Why do you want to <u>do</u> that to me? Now I have to wonder, <u>what</u> woman? <u>what</u> stuff? <u>where</u>? <u>here</u>? He told me he had a live-in here. <u>What</u> did she look like? Was she prettier than I? Was she younger? What kind of competition <u>is</u> she?
>
> When you make me wonder, I wonder. BIG-time.
>
> . . . .
>
> I ~~told~~ asked you not to talk about other women to me. But there is something more cruel than that, even. It is bringing them up, & making me wonder. And worry.
>
> . . . .
>
> . . . I love you. I want to keep you.

In the other version of the letter, Thompson also accused Frank of lying to her and of being sly and evasive.

Frank's telephone records show that on Tuesday, July 23, he made two long-distance calls to Thompson's number and talked for 38 minutes one time and 37 minutes the other time. Thompson testified that Frank had told her he did not think about the letter she had left in his trailer the previous day and

that he had just thrown it in a drawer.

A letter which the defendant testified that she wrote on July 23 was found in Frank's trailer after his death. It contained four paragraphs which, according to the letter, were added after Thompson talked to Frank on that night:

> So I tried to communicate with you & you "threw it in a drawer." That's what I'm worth to you. Guess I was ready for that; I had this written yesterday.
>
> Like I said, minimum of hard feelings. I don't need you for an enemy.
>
> Sure sorry I . . . ruined our friendship. . . .
>
> You left shit here. I don't think you'll worry too much about it. Seems you told me you left stuff at bitch's [sic] places ALL OVER the country, I'm just another one now.

The following day, July 24, Thompson began a letter to her son, informing him that she had a "Fatal Fight" with Frank. Discussing this "Fatal Fight," Thompson stated:

> What was our Fatal Fight, do you wonder? Oh, it's a LONG story, Kid, I mean *things have been HAPPENING since you left. Mommy was naughty, & Mommy is payin' now.* Come to find out that not only VERY RICH OLD LADIES like Grandma . . . need to worry about men romancing them for their money. Dean was trying to romance ME for the money & farm he THOUGHT I'd have soon.

(Emphasis supplied.)

In the letter, Thompson speculated at length that Frank was going to give her trouble and that he might harm her pet pig, break in, or suggest to others that Thompson should be robbed. She commented numerous times about how worried and scared she was, although she admitted that she often got "overexcited about everything & often overreact[ed]."

Thompson also referred in the letter to a previous relationship: "I remember Ron. I remember lots of violence & threats & evil behavior, and how . . . STUPID I can be, & I DO expect real problems now from Dean, too."

Thompson stated that she was a fool and that her ego was crushed flat. However, she concluded by reassuring her son, "[D]on't worry about me, now. . . . Remember, I may whine &

cry, but *I is a TOUGH old lady, and a damn good shot, too*." (Emphasis supplied.)

On July 25, Thompson was in Jedlicka's Hardware Hank store in Verdigre. At that time she purchased .357 shells and inquired about the type of hardware needed to hold a 2- by 4-inch board against a door to secure it. The owner of the hardware store testified that he did not have the type of brace requested by Thompson, and he referred her to a welder. Thompson testified that she had brackets made for an entry doorway sometime in July or August. Those brackets and a 2- by 4-inch board were found in place on one of Thompson's doors the day Frank was killed.

On Sunday, July 28, Thompson went with Frank to a state park. A state conservation officer visited briefly with them as they were leaving, and he testified that Thompson was sitting in the middle of the front seat of the car next to Frank.

That same day, Frank gave Thompson $300 for her upcoming trip to Chicago. Thompson testified that Frank was being pushy that day on the issue of marriage and that she told him she would not marry him. Thompson claimed that she could not remember Frank's words in response to her rejection of him, but that his statement reminded her of an old saying of her mother's to the effect that "if I can't have you, nobody else will. Meaning if you don't marry me, I will kill you."

On August 1, Thompson flew to Chicago to see her son graduate from Navy boot camp. Telephone records indicate that Thompson called Frank collect five times during her 4-day stay in the Chicago area, the conversations each lasting between 9 and 26 minutes.

Thompson returned from Chicago on August 4. On the way home, Thompson stopped and telephoned Frank's ex-wife, Betty Frank. Betty Frank testified that Thompson informed her that she and Frank were planning on getting married, and that Thompson said she wanted to get better acquainted and to discuss with her visitation rights with the children.

However, Thompson testified that she no longer wanted to discuss visitation rights at the time she called and that the real purpose of the call was to gather information to find out if Frank meant his threat to kill her made the previous week. Betty

Frank refused to meet with Thompson and hung up.

When she returned to her farm, Thompson called Frank and talked to him for over one-half hour.

The following day, August 5, Thompson contacted Delores Fischer, a former girl friend of Frank's who lived in Atkinson, and arranged to meet her that day. Thompson testified that Fischer told her that once, when he was drunk, Frank had threatened to slit Fischer's throat. Thompson testified that after her conversation with Fischer, she decided that Frank was dangerous and that there was no longer a possibility of a relationship with Frank. When Frank called Thompson that night, she called him a dirty name and hung up on him.

The evening of August 5, Thompson wrote to her son explaining that she had not been "flirting" with Frank when she had called him from Chicago, but that she was merely "postponing," because if she could keep Frank hoping, he would not harm her home or her pet pig.

Thompson stated that she would not allow Frank to come over and fix her pig's irrigation pipe, even though he was willing to do so. She wrote to her son that she might have "blown [her] front" by refusing to see Frank that evening, but that she could not bear to have Frank drooling and weeping on her. Moreover, she wrote, Frank had "a face like a drowning rat . . . who could stand it w/o vomiting?"

Thompson admitted to her son that she did "kiss [Frank] & stuff." She reiterated her belief that Frank was interested in the money she might inherit from her mother, rather than "want[ing her] body" as she had originally thought. Thompson was pleased that she, "the Honor Student," had figured this out before Frank "took" her for anything, even though it had taken her a month to do so. To the contrary, Thompson wrote in reference to Frank, "I took HIM! He's been spending a lot of money on me this last month. Serves him right. My single BIGGEST take was the $300 he gave me to fly to Chicago. Sucker!"

Thompson told her son that the reason she was afraid of Frank was because Frank would be "pissed" when he figured out that he was getting nothing from Thompson. She thought he might be able to figure things out "w/ his half a brain."

However, Thompson concluded, "He's a liar, a user, AND a fool, and I ain't THAT scared of him. I'll just sleep w/ my .357 tonight . . . (grin)."

On August 6, Thompson returned to Jedlicka's Hardware Hank store and exchanged a box of ".357 Max" shells suitable for a rifle for a box of .357 Magnum cartridges for use in a revolver.

Also on August 6, Thompson wrote a letter to a friend in Omaha discussing Fischer. Thompson wrote that she had concluded, after meeting and talking to Fischer, that Fischer still cared about Frank and still wanted "to do him." This made her "dislike" Fischer, Thompson wrote to her friend, but she could see Fischer's weakness and loneliness and have pity.

In the same letter, Thompson referred to Frank as "a classic sociopath." She wrote that "[Frank's] MISTAKE was in being a FALSE FRIEND to an INTELLIGENT & non-desperate lady."

On August 7, Frank wrote Thompson a letter which stated in part:

> You went downtown got in a good argument with people and got Slaped arround [sic]! to [sic] Bad you got beat up!
>
> . . . .
> I TOLD YOU MY PAST IS DEAD! NOW IT IS GONE TOO!
> YOU ARE REALLY INTO THE WRONG WORLD IF YOU BELIEVE OTHERS!
> I TOLD YOU THE TRUTH!
> LOVE!
> /s/ Dean

On August 8, Thompson wrote Fischer a letter in which she admitted spending the night with Frank on Sunday, June 16, but denied that she "took any of [her] clothes off." Thompson was aware that Fischer had spent the night with Frank in his trailer on a Saturday night in June, perhaps the night previous to Thompson's visit. She made the following comments about her relationship with Frank:

> You see, what happened, Dean started telling me after that he loved me so much that he hadn't been screwing anyone else at all for months. And I was stupid enough to

believe that!

So I didn't know he was seeing you then or I sure wouldn't have let him waste my time, and backstab you, by putting that snow job on me.

. . . .

When I want a Houseboy I'll hire one, I won't have someone pretending to be my friend come sucking up to me and lying to me to get my money.

Frank's telephone bill indicates that on August 10 he called Thompson at 6:40 p.m. and talked for 213 minutes. Thompson testified that she did not remember the conversation very well, but that she simply gave Frank the opportunity to talk.

On August 11, Frank was at Thompson's farm, where he fixed the pig's irrigation pipe and moved a refrigerator. Thompson testified that she told Frank on that day never to come back to her farm and that Frank wrote out a piece of paper giving Thompson all his property which he had stored on her farm, including a 1973 Ford pickup. That document and the title to the pickup were found in Thompson's kitchen after Frank was killed.

On Monday, August 12, Thompson wrote to her son that she "took a chance" by letting Frank come over to help her. She was willing to take such a chance because she "[knew] male psychology. Men are too STUPID to ever GIVE UP."

Having been rebuffed by Betty Frank when she attempted to talk to her on August 4, Thompson wrote her a letter dated August 13. In that letter, Thompson again said that her original purpose in contacting Betty Frank had been to meet her because Thompson and Frank had planned to be married. However, Thompson stated, "Amazing how quickly things can change! The engagement is off." Thompson informed Betty Frank that Frank had been lying to her a lot, and she questioned her about what might happen next.

How violent is he? He threatened to kill me if I wouldn't marry him, but I think that's a standard threat. Please tell me if I should, and how much, worry about retaliation from him? No-one would know about that better than you, I think. At least you are still alive, and that's encouraging.

On Saturday, August 17, the day before she shot Frank, Thompson wrote a final letter to her son, in which she stated that Frank had been calling her all week, but that she had not told him what she really thought of him. Thompson stated:

> This girlfriend of his that I met in Atkinson told me that he got all drunk before and threatened to slit her throat, and Mrs. Boham told me a few days ago . . . that he used to beat his wife all the time when they lived out here.
>
> I don't want that psycho AROUND. I bought a new box of .357 shells & I'm gonna load up and PRACTICE some this afternoon! I bought a new box of .25 shells a while back, and if I can find it I'll give the little guy some exercise, too.

A resident of a farm about one-quarter mile from Thompson's testified that he heard shots which sounded like someone target practicing in the Thompson yard area on Saturday afternoon, August 17. It sounded to him as if two different calibers of guns were being used because one group of shots was louder than another group of shots.

That evening, Frank called Thompson at 7:06 p.m. and talked for 51 minutes. He called again at 10:12 p.m. and talked for 16 minutes. At 10:43 p.m., Thompson called the Knox County sheriff's office and reported to Don Henery, the chief investigator for the sheriff's office, a threatening phone call that she had received. Henery testified that Thompson reported that she and Frank had argued earlier in the week and that Frank had just called and threatened to send the "Gatz boys" out to her place.

Thompson also told Henery that Frank was angry because she refused to marry him and that Frank had previously threatened her. Henery testified that Thompson was very calm and matter-of-fact on the telephone, that she did not request that he come out, and that he advised her to tape-record future threatening conversations.

Frank's telephone records show that he called Thompson at 1:05 a.m. on August 18 and talked for 13 minutes. Thompson testified that Frank screamed things at her, threatening to slit her throat for checking up on him, shoot her truck full of holes with her in it, burn her house, and butcher her pig. However,

Thompson testified that she did not believe Frank was an immediate threat, because he sounded "drunk out of his mind," and she believed he was in Atkinson, at least 2 hours away.

Frank called Thompson again at 7:08 a.m. Thompson claims he repeated his threats, this time in a calm and quiet voice. Frank's telephone records indicate that this call lasted 2 minutes, although Thompson testified that it seemed like Frank had said nasty things to her for a long time. The Knox County sheriff's log shows that more than 5 hours later, at 12:26 p.m., Thompson called the sheriff's office and reported Frank's threatening phone calls to Deputy Lee Waterman.

Thompson kept notes about Frank and the events of August 17 and 18 on her computer. The computer disk containing those notes, as well as disks containing Thompson's correspondence with Steven and with other people, was seized by the sheriff, printed out, and entered into evidence at trial. The file name for Thompson's notes of August 17 and 18 was "Assault Report."

On August 18, Thompson wrote, "I called Deputy Waterman at 12:22 (noon). . . . I called Dean a 'dangerous psycho' and told Deputy Waterman how scared of him I am." Deputy Waterman instructed Thompson on how to obtain a restraining order and advised her to do so on Monday, the following day.

At 3:12 p.m., Frank again called Thompson, and they talked for 32 minutes. Thompson testified that Frank did not threaten her at that time. She wrote in her computer notes that Frank "sounded calmer, but like he were going to burst into tears any second." She testified at trial that Frank "sounded like his normal self and he talked about normal stuff." Before he hung up, Frank told Thompson he was going to put clothes into the dryer and go grocery shopping. Thompson testified that she did not invite Frank to her house, nor did he give her any indication that he was coming over.

A few minutes later, Delores Fischer called and told Thompson that Frank had been at her place from 12:30 to 2 p.m. and had seemed all right. Fischer testified that Frank had watched TV, napped, and had two cans of beer during that time. Fischer also informed Thompson that she had talked to Bea

Gatz, the mother of the Gatz boys, and that Bea had reassured her that the boys were harmless.

Thompson testified that, later, as she was sitting in the dining room at her computer writing about Frank's threats to her, she heard a car door slam. Thompson claims she went into the adjacent storage room, saw Frank's car from the window, and became frightened because she had not thought he would actually come to her house and attack her. She testified that she thought she should get back to where her gun was, on a chair next to where she had been sitting working on the computer, and quickly went back to the computer. As she returned to her chair, she saw Frank in the doorway between the kitchen and the dining room.

Frank told Thompson he had brought groceries, and she instructed him to put them in the refrigerator. Thompson testified that Frank walked toward the refrigerator, then suddenly whirled toward her, screaming, " 'I'm [unintelligible two-syllable word] kill you.' " Although she did not actually hear the words, Thompson was sure that Frank had said, "I'm going to kill you," because it fit the situation. Knox County Sheriff Wes Eisenbeiss testified that in his conversations with Thompson after the shooting, she did not mention anything Frank had said to her before she shot him. She only told him that Frank had "made a noise."

Thompson testified that Frank then "lunged" toward her and that she grabbed her .357 Magnum from the chair, pointed it at Frank with both hands, and said, "[H]uh-uh." She said that when Frank did not stop moving toward her, she rapid-fired all six rounds in her handgun. She testified that although the shots stopped Frank, she "couldn't stop pulling the trigger," so she aimed the last shots down and away from him.

The sheriff's log indicates that Thompson called at 5:35 p.m. to report the shooting. Deputies arrived at Thompson's farm at 6:25 p.m. and were admitted to the house by Thompson.

The deputies found Frank lying on the floor of the computer room and a pool of blood on the floor. To the left of Frank's head were words written in blood on the floor which appeared to say "self defense," although the second word was difficult to make out. There was testimony at trial that Frank was right

handed. No blood was found on Frank's right hand, but there was blood noted on his left hand. Deputies also found a note in an open suitcase nearby with the words "I love Fran," "self defense," and "Dean" each written twice and the words "Fran I love you" written once.

When a deputy asked Thompson what Frank had been shot with, she handed him a loaded Colt Python .357 Magnum gun. She testified that she had reloaded the weapon while calling the sheriff's office to report the shooting.

After determining that Frank was still alive, the deputies requested assistance from the rescue squad. When squad members entered the house, Thompson was sitting on the arm of a chair beside Frank, smoking a cigarette. In response to questioning, Thompson stated that she did not know where she had shot Frank, or how many times.

Rescue squad members testified that Frank was lying on the floor on his left side in a fetal position, his knees drawn up to his chest. He was biting on a pillow and moaning. A bag containing a package of lunchmeat was found underneath his side. In response to questioning, Frank replied, "Just leave me alone and let me die." Frank's condition then deteriorated rapidly, and he was unable to respond verbally thereafter. A preliminary examination by squad members revealed two abdominal wounds and a back wound. One of the abdominal wounds was bleeding profusely.

By 6:30 p.m., Frank had no discernible blood pressure, pulse, or respirations and was totally unresponsive. Efforts at cardiopulmonary resuscitation proved unsuccessful, and Frank was pronounced dead by a local physician at 7 p.m., 4 minutes after the rescue squad arrived in Verdigre.

Thompson was taken into custody that evening as a material witness. She commented several times to a deputy that "it did not turn out like TV." Sheriff Eisenbeiss testified that when he inquired how Thompson was standing up under the events of the day, she responded that it was self-defense, that Frank was going to kill her, that Frank had made threats to her, and that he was going to get the Gatz boys after her. Thompson also told Sheriff Eisenbeiss, "Maybe he wouldn't have done anything to me, but I have read where women waited too long to defend or

protect themselves."

Thompson expressed hope that the sheriff could test her hands for the presence of blood "so they don't think I wrote the note in blood." She informed the sheriff that Frank had written the note in blood. Sheriff Eisenbeiss testified that he did not observe blood on Thompson's hands at the time.

An autopsy performed on Frank's body revealed a wound from a bullet which entered his left abdomen and exited his back. Two other bullets entered from the back. One entered Frank's right hip, shattering his hip bone and lodging in the bone. The other entered his right back, passed through his liver and right lung, and exited through his lower chest, striking his right elbow area.

During the course of their investigation, deputies found three bullet holes in Thompson's dining room floor next to where Frank had been lying. The path of the bullets was reconstructed by placing rods through the dining room floor in order to determine the angle from which the bullets were fired. Those three bullets appeared to have been fired from an area in the dining room in front of the doors to Thompson's storage room. Thompson claimed that she was standing next to her computer when she shot Frank.

No blood was found anywhere in the house except in the immediate area where Frank was lying when law enforcement officials arrived, even though Thompson testified that Frank moved around quite a bit after being shot.

Thompson admitted that there was an ashtray full of cigarette butts which could have been hers on top of a refrigerator in the storage room. That room was one from which Thompson could see to the front of the house.

Sheriff Eisenbeiss testified that Thompson told him she *heard* Frank open the kitchen refrigerator door, and she thought he took off his boots in the kitchen. Photographs taken from the area of the computer demonstrate clearly that the kitchen area, including the refrigerator, could easily be *seen* by a person at the computer.

Deputies found two cans of Mace in Thompson's bedroom. A loaded .25-caliber semiautomatic handgun was found under her pillow.

On September 12, 1991, Thompson was charged by information with first degree murder and use of a firearm to commit a felony in the killing of Frank. She was subsequently convicted by a jury of both charges. Thompson was sentenced to life imprisonment for first degree murder and to 10 years' imprisonment for the firearm charge, the sentences to run consecutively. She now appeals her convictions to this court.

## ASSIGNMENTS OF ERROR

The defendant claims that the trial court erred in (1) refusing to admit evidence of the physical abuse which she allegedly suffered at the hands of a former boyfriend as evidence in support of her claim of self-defense, and because the State introduced a letter written by Thompson alluding to that abuse during its case in chief; (2) failing to grant her motion for new trial due to insufficiency of the evidence to support the verdict; and (3) failing to permit limited, sequestered, and individual voir dire of the jury.

## ADMISSIBILITY OF PRIOR ABUSE

The defendant contends that the district court erred in refusing to admit evidence of the physical abuse she allegedly had suffered in 1983 at the hands of a former boyfriend, Ron Thompson. Although the defendant was never married to Ron Thompson, she apparently lived with him from 1980 to 1983 and had her and her son's last names legally changed to Thompson during that time period.

Thompson sought to testify on the witness stand about the alleged abusive and threatening relationship she had with Ron Thompson, but was prevented from doing so upon a relevance objection by the State. The court sustained the objection on the basis that what had happened 8 years previously with another man was not relevant to Thompson's response to threats made by Frank. Without making an immediate offer of proof following the trial court's ruling, the defendant continued to answer questions on her direct examination.

Later that day, the defense submitted as an offer of proof an 11-page report Thompson herself had written and filed with the Washington County sheriff's office on March 20, 1983. That report detailed a bizarre 2-day episode on March 16 and 17,

1983, in which Ron Thompson allegedly raped the defendant, held her captive, and repeatedly threatened her with surgical mutilation and death.

Based on the offer of proof, the trial court again found the proffered testimony to be irrelevant because it involved a third party rather than the victim and because the abuse had occurred over 8 years prior to the time the defendant killed Frank. The court also found that the evidence should be excluded under Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 1989), because of the danger that the acts of Ron Thompson might be imputed by the jury to Frank, thus creating unfair prejudice, confusing the issues, or misleading the jury. The court stated that the issue in the case was Thompson's state of mind toward the victim, not her state of mind toward Ron Thompson.

The defendant argues that the evidence should have been admitted to show that she acted in a reasonable fashion in defending herself against Frank. She further maintains that such evidence was necessary to explain her reference to Ron Thompson in the letter to her son dated July 24, which was introduced by the State as part of its case in chief.

"[I]n all proceedings where the Nebraska Evidence Rules apply, admissibility of evidence is controlled by the Nebraska Evidence Rules, not judicial discretion, except in those instances under the Nebraska Evidence Rules when judicial discretion is a factor involved in admissibility of evidence . . . ." *State v. Messersmith*, 238 Neb. 924, 936, 473 N.W.2d 83, 92 (1991). Accord, *State v. Toney*, 243 Neb. 237, 498 N.W.2d 544 (1993); *State v. Peterson*, 242 Neb. 286, 494 N.W.2d 551 (1993).

Initially, we address Thompson's claim that the evidence of her abuse by "a person," Ron Thompson, was admissible under Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Reissue 1989), to show that Frank's actions made Thompson angry, frustrated, and frightened, because the actions of the two men were directly related in Thompson's mind. This is a misapplication of rule 404(2), which states:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of *a person* in order to show that *he or she* acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive,

opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

(Emphasis supplied.)

Although the statute does not expressly state that the "other crimes, wrongs, or acts" must be those of the accused and not of a third party, it is obviously implied, and we have previously held that to be the case. In *State v. Timmerman*, 240 Neb. 74, 87, 480 N.W.2d 411, 419 (1992), we stated that "[u]nder rule 404(2), evidence of other crimes is not admissible unless there is sufficient evidence that the crimes were actually committed *and that the defendant* committed them . . . ." (Emphasis supplied.)

We based our holding on *Huddleston v. United States*, 485 U.S. 681, 689, 108 S. Ct. 1496, 99 L. Ed. 2d 771 (1988), in which the U.S. Supreme Court held that "[e]vidence is admissible under Rule 404(b) *only if it is relevant.* . . . In the Rule 404(b) context, similar act evidence is relevant only if the jury can reasonably conclude that the act occurred *and that the defendant* was the actor." (Emphasis supplied.)

Because Thompson was attempting to introduce evidence of the acts of a third party to show that she acted reasonably in defending herself against Frank, that evidence is irrelevant and therefore inadmissible in the context of rule 404(2).

Even though evidence of Ron Thompson's abuse of the defendant is not admissible as an other act, that does not mean it is inadmissible for any purpose. All relevant evidence normally is admissible. Evidence which is not relevant is not admissible. See Neb. Evid. R. 402, Neb. Rev. Stat. § 27-402 (Reissue 1989). Relevant evidence means "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Neb. Evid. R. 401, Neb. Rev. Stat. § 27-401 (Reissue 1989).

Our research has found no cases, nor have we been cited to any, in which a defendant has been permitted to introduce evidence of one episode of abuse by one individual to support the defendant's claim of self-defense in killing a second individual many years later. Moreover, we have found no cases in which a defendant has been permitted to introduce evidence of prior abuse to support the killing in self-defense of a victim

who has always behaved as a "perfect gentleman" and who has concededly never laid a hand on the defendant. Finally, we have found no cases in which evidence of prior abuse has been used to support the self-defense killing of a victim whose alleged "abuse" of a defendant consisted of three or four threats, all but one of which was by telephone from many miles away.

We therefore conclude that the evidence of Ron Thompson's alleged abuse of the defendant is irrelevant, because it fails to make the existence of any fact that is of consequence to the determination of the defendant's claim of self-defense more or less probable than it would otherwise be, without such evidence. The trial court did not commit error in excluding the evidence for lack of relevance. Because we have determined that the evidence was not relevant, we need not consider whether it was properly excluded under rule 403.

The defendant also appears to argue that evidence of the defendant's prior abuse is admissible under Neb. Evid. R. 106, Neb. Rev. Stat. § 27-106 (Reissue 1989), although she does not cite that statute. The State had introduced into evidence in its case in chief a letter to the defendant's son in which she referred to Ron Thompson. However, admission of evidence under rule 106, the rule of completeness, is not automatic. Even under rule 106, the evidence sought to be admitted must be relevant to the issues in the case. See *State v. Schrein, ante* p. 136, 504 N.W.2d 827 (1993).

Having determined that evidence of Ron Thompson's prior abuse of the defendant is not relevant for any purpose, we find that this assignment of error is without merit.

### MOTION FOR NEW TRIAL

Next, we turn to Thompson's claim that the district court erred in overruling her motion for new trial due to insufficiency of the evidence to support the verdict, pursuant to Neb. Rev. Stat. § 29-2101 (Reissue 1989). Although the district court apparently overruled the motion on its merits, the State argues that this assignment of error is not properly before this court because the motion for new trial was not timely filed.

Neb. Rev. Stat. § 29-2103 (Reissue 1989) provides in relevant part that "[an application for new trial] shall, *except for the*

*cause of newly discovered evidence* material for the party applying, which he [or she] could not with reasonable diligence have discovered and produced at the trial, be filed *within ten days after the verdict was rendered unless unavoidably prevented.*" (Emphasis supplied.)

On August 19, 1992, jury verdicts were rendered against Thompson for first degree murder and for the use of a firearm in the commission of a felony. Her motion for new trial was filed on September 2. Because August 29, the 10th day after August 19, fell on a Saturday, the latest date the motion could have been filed in compliance with the statute was Monday, August 31. See Neb. Rev. Stat. § 25-2221 (Reissue 1989). Therefore, the filing of Thompson's motion on Wednesday, September 2, was 2 days late unless it fell within one of the two statutory exceptions to the 10-day requirement.

Section 29-2103 makes exceptions to that requirement for newly discovered evidence material for the party applying, which he or she could not with reasonable diligence have discovered and produced at trial, and in situations where a party is "unavoidably prevented" from filing on time. The defendant's motion for new trial alleges neither. Rather, it alleges that there was irregularity in the proceedings of the trial court, that the verdict was not sustained by sufficient evidence, and that errors of law occurred at trial.

The defendant's attorney did file in this court on April 22, 1993, an "Application for Leave to Supplement Record" and an "Affidavit of Counsel." In his affidavit, defense counsel gives a variety of reasons he was unavoidably prevented from filing Thompson's motion for new trial on time. He further alleges that the Knox County Attorney waived the timely filing of the motion.

However, our holding in *Taylor Dairy Products Co. v. Owen*, 139 Neb. 603, 298 N.W. 332 (1941), prevents us from considering defense counsel's affidavit. In that case, a party attempted to file an appeal bond on the last day permitted by statute, but found the county judge gone and the courthouse closed for Lincoln's Birthday, although it was not a legal court holiday. The appeal bond was filed on the following day. On appeal to this court, the party urged, apparently by means of

affidavit, that he had attempted a timely filing. We held:

> Even if this situation warranted the filing of the bond on the eleventh day, it is of no avail here because *it is not shown by the record.* . . . The record is barren of evidence or findings of any default on the part of the county judge which prevented a timely appeal. The record imports absolute verity, and when a party attempts to escape the effect of a plain provision of statute by proof of special circumstances, bringing the matter within a recognized exception, *it must appear from the record that such an issue was before the district court. The filing of affidavits in this court is not a proper way to present such an issue here.*

(Emphasis supplied.) *Taylor Dairy Products Co. v. Owen*, 139 Neb. at 605, 298 N.W. at 333.

It does not appear from the record in this case that the issue of the timeliness of the defendant's motion for new trial was ever before the district court. Therefore, she has not brought herself within either of the recognized exceptions to the requirement that a motion for new trial be filed within 10 days. Nor does defense counsel's affidavit in this court properly raise the issue.

Moreover, this court has long held that § 29-2103 by its terms is mandatory. See, *Parker v. State*, 164 Neb. 614, 83 N.W.2d 347 (1957); *McCoy v. State*, 110 Neb. 360, 193 N.W. 716 (1923). A motion for new trial not filed in conformity with the statutory requirements as to time may not be considered by an appellate court on review. See *Parker v. State, supra.*

Although the State is correct that the defendant's motion for new trial is not properly before this court, we note that a motion for new trial is not a prerequisite to obtaining appellate review for insufficiency of evidence to support a judgment. See Neb. Rev. Stat. § 25-1912.01(2) (Reissue 1989). Because of the seriousness of the offenses of which the defendant has been convicted, we exercise our option to review the record for plain error as to whether the evidence is sufficient to support the defendant's conviction for first degree murder. See Neb. Rev. Stat. § 25-1919 (Cum. Supp. 1992).

A verdict in a criminal case must be sustained if the

evidence, viewed and construed most favorably to the State, is sufficient to support that verdict. Moreover, on such a claim, an appellate court will not set aside a guilty verdict in a criminal case where such verdict is supported by relevant evidence. Only where evidence lacks sufficient probative force as a matter of law may an appellate court set aside a guilty verdict as unsupported by evidence beyond a reasonable doubt.

*State v. Connely*, 243 Neb. 319, 333, 499 N.W.2d 65, 75 (1993).

In finding a defendant guilty beyond a reasonable doubt, a jury may rely upon circumstantial evidence and the inferences that may be drawn therefrom. *State v. Batiste*, 231 Neb. 481, 437 N.W.2d 125 (1989), *disapproved on other grounds, State v. Pettit*, 233 Neb. 436, 445 N.W.2d 890 (1989). Circumstantial evidence is evidence which, without going directly to prove the existence of a fact, gives rise to a logical inference that such fact exists. *State v. Tucker*, 242 Neb. 336, 494 N.W.2d 572 (1993). Circumstantial evidence is evidence of one or more facts from which another fact can logically be inferred. *Id.*

A person commits murder in the first degree if he or she kills another person purposely and with deliberate and premeditated malice. Neb. Rev. Stat. § 28-303(1) (Reissue 1989). "Purposely," as an element of first degree murder, means intentionally. *State v. Reynolds*, 235 Neb. 662, 457 N.W.2d 405 (1990). The intent involved in an actor's conduct is a mental process and may be inferred from the conduct itself; the actor's language, if any, in reference to the conduct; and the circumstances surrounding the conduct. *State v. Russell*, 243 Neb. 106, 497 N.W.2d 393 (1993).

"Malice," like intent, concerns the state of mind of the slayer and may be inferred from the words and acts of the defendant, the circumstances surrounding his or her conduct, and the evidence relating to the circumstances of the criminal act. See *State v. Illig*, 237 Neb. 598, 467 N.W.2d 375 (1991). Malice is that condition of the mind which is manifested by the intentional doing of a wrongful act without just cause or excuse. *State v. Nielsen*, 243 Neb. 202, 498 N.W.2d 527 (1993).

"Deliberate malice" and "premeditated malice" are separate and distinct elements of the crime of murder in

the first degree. . . .

"Deliberate" means not suddenly, not rashly; but deliberation requires that the defendant considered the probable consequences of his or her act before doing the act. . . . A person kills with "deliberate malice" when he or she, without just cause or excuse, kills another not suddenly or rashly, but after considering the probable consequences of doing the act.

"Premeditated" means to have formed a design to commit an act before it is done. . . . A person kills with "premeditated malice" if before the act causing the death occurs, he or she has formed the intent or determined to kill the victim without legal justification.

(Citations omitted.) *State v. Batiste*, 231 Neb. at 491, 437 N.W.2d at 132.

One way in which a jury could infer the malice the defendant felt toward Frank is from the defendant's words in her correspondence with others. The tone of her letters in discussing Frank was contemptuous. Among other things, she referred to him as a fool, a sucker, and a houseboy. On several occasions, she ridiculed his physical appearance. The defendant belittled Frank's intellect, while referring frequently to her own superior intelligence and status as a Mensa member and an honor student.

A jury could also infer from the defendant's acts in the days preceding the killing, as well as on the day of the killing, that the defendant killed Frank intentionally and with malice. The day after she had written to her son about a "Fatal Fight" with Frank, the defendant purchased ammunition for her .357 Magnum handgun. Later, she wrote to her son that she was not that scared of Frank and that she would just sleep with her .357 Magnum. The following day, the defendant exchanged the ammunition she had erroneously purchased for the kind that would fit her .357 Magnum handgun.

The day before she shot and killed Frank, the defendant wrote to her son that she did not want "that psycho" around, that she had purchased new ammunition, and that she was going to "load up and PRACTICE" that afternoon with her two handguns. A neighbor of the defendant's heard what

appeared to be target practicing in the direction of the defendant's farm that afternoon.

When Frank arrived at the defendant's farmhouse the following afternoon, she had her loaded .357 Magnum handgun at her side. Although the defendant had two cans of Mace available, she had armed herself with a lethal weapon. She also chose to use her .357 Magnum rather than her smaller, .25-caliber semiautomatic handgun. The .357 Magnum was loaded with hollow point bullets, a type of ammunition designed to mushroom upon impact and thereby increase the wounding power of the bullet.

A jury could conclude from the evidence of an ashtray full of cigarette butts on top of a refrigerator in the defendant's storage room that she may have expected Frank and was in fact watching for him in that room. It was a room from which the defendant could see to the front of the house. A jury could also find that the trajectory of the three bullets which were fired into the floor was consistent with those shots being fired from an area in front of the door to the storage room, and not from behind the computer table as the defendant claimed.

The length of time it takes to kill another is evidence from which the intent of the killer may be inferred. See *State v. Batiste, supra.* The forensic pathologist who performed the autopsy on Frank, Dr. Brad Randall, testified that the gunshot to Frank's right back shattered the right lobe of his liver and that such an injury would cause an individual to lose a large amount of blood very quickly. In his opinion, an individual would only live 10 to 15 minutes after suffering a gunshot such as Frank received to his right lung and liver and would probably lose consciousness within 5 to 10 minutes after sustaining such a wound. Frank was still breathing when sheriff's deputies and rescue personnel arrived 50 minutes after the defendant reported the shooting. However, only 5 minutes later, Frank had become unresponsive to any type of stimulus and had no discernible blood pressure, pulse, or respirations.

There was evidence from the appearance of the wound to Frank's upper left abdomen that Frank had survived for some period of time after that wound was sustained. The two wounds to Frank's back did not have this characteristic appearance.

Additionally, Dr. Randall concluded from the nature of the exit wound in Frank's right chest and the injury to his right elbow that Frank's right arm was against or near to his body as that bullet passed through and that this could have occurred if Frank had been lying on the floor with his arm under him when that shot was fired.

These findings led Dr. Randall to believe that the three gunshot wounds were not all inflicted at the same time in "rapid fire" sequence as the defendant claimed and that the shot to Frank's right back was possibly fired shortly before law enforcement and rescue squad personnel arrived.

Two high school boys hitting golf balls at a neighboring farm testified that they heard two to three shots. One of the boys placed the time of the shots at about 5:20 to 5:30 p.m. This was a few minutes after the other boy had seen a car turn into Thompson's driveway. The boys continued hitting golf balls until 6 p.m., but neither heard any other shots.

From these facts, as well as from the fact that Frank was apparently able to write a note in blood on the floor as well as a note on a piece of paper sometime during the course of events, a jury could properly find that the defendant inflicted the three gunshots upon Frank over a period of time, and not in rapid succession as she claimed.

Malice may be inferred from the shooting of another person with a deadly weapon. *State v. Nielsen*, 243 Neb. 202, 498 N.W.2d 527 (1993). The defendant was trained in the use of firearms as a security guard, owned several weapons of various types, and target-practiced with regularity. She considered herself a good shot, and her son testified that this was true. Although she had chemical Mace and a small-caliber handgun readily available to her, she chose a large-caliber handgun loaded with a very damaging type of bullet as a weapon of first resort.

Mark Bohaty, a Nebraska State Patrol firearms examiner, testified that the defendant's weapon was a double-action revolver which required 12 pounds of force on the trigger to fire. It was not a semiautomatic or automatic weapon and therefore required that much force to fire each bullet. The weapon could also be operated single-action by cocking the

hammer back and applying 3 to 3¼ pounds of pressure to the trigger each time the weapon was fired.

The location, nature, and number of wounds inflicted are circumstances from which a jury may draw the inference that a killing was done with deliberate and premeditated malice. *State v. Nielsen, supra.* The defendant fired all six rounds in her revolver, striking Frank in the torso once in the front and twice in his back and striking the floor three times.

Based upon all the direct and circumstantial evidence in this case, the jury could have found beyond a reasonable doubt that the defendant's words and conduct in the days and hours before the shooting, as well as the circumstances surrounding the shooting itself, were sufficient to prove that the defendant intended to kill Frank and that she did so with deliberate and premeditated malice after incapacitating Frank and exacting two exculpatory notes from him, one written in his own blood.

The evidence was also sufficient to reject the defendant's claim of self-defense. Because the defendant claims that she shot Frank in self-defense, the State was required to prove beyond a reasonable doubt not only that the defendant committed murder in the first degree, but that she killed Frank without justification.

Neb. Rev. Stat. § 28-1409 (Reissue 1989) provides:

(1) . . . [T]he use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself [or herself] against the use of unlawful force by such other person on the present occasion.

. . . .

(4) The use of deadly force shall not be justifiable under this section unless the actor believes that such force is necessary to protect himself [or herself] against death . . . .

. . . .

(5) . . . [A] person employing protective force may estimate the necessity thereof under the circumstances as he [or she] believes them to be when the force is used . . . .

This court has long held that a defendant asserting self-defense as justification for the use of force must have a reasonable and good faith belief in the necessity of such force.

See, *State v. Stueben*, 240 Neb. 170, 481 N.W.2d 178 (1992); *Housh v. State*, 43 Neb. 163, 61 N.W. 571 (1895). The principle which underlies the rule is that human life should not be made to depend upon conditions so unreliable and hazardous as the bare belief of any person that he or she is in danger of death or bodily harm. *State v. Stueben, supra*; *State v. Archbold*, 178 Neb. 433, 133 N.W.2d 601 (1965); *Housh v. State, supra*. A defendant's claim of self-defense is a question of fact for the jury. See *State v. Stewart*, 205 Neb. 626, 288 N.W.2d 751 (1980).

The facts of this case are more than sufficient for a jury to conclude beyond a reasonable doubt that the defendant did not have a reasonable and good faith belief in the necessity to use deadly force against Frank and that the defendant was in fact the aggressor. She appeared to be making plans for some type of hostile encounter with Frank for several weeks prior to the shooting. The defendant had even started a computer file on August 17 titled "Assault Report," even though she had been assaulted by no one.

Thompson admitted that Frank had been a "perfect gentleman" for 6 years and had never abused her. Thompson claimed that Sharon Boham had told her of multiple incidents of Frank beating his ex-wife. However, Boham testified that she had told Thompson that she had heard of one incident, which she referred to as "hearsay," in which Frank had shoved his ex-wife.

Frank's ex-wife denied at trial that Frank had ever physically abused her, as did Delores Fischer, Frank's former girl friend. Both testified that Frank became verbally abusive and threatening only when he had been drinking. Frank's blood alcohol content upon autopsy was .000. The pathologist testified that there would have been very little decrease in blood alcohol content from the time Frank died until the time of autopsy.

Thompson could not even remember the words of the one threat which she claimed Frank made to her in person, and she admitted at trial that she did not understand what he said to her just before she shot him. She wrote to her son that she was not that scared of Frank. No one else testified to being aware of any threats made by Frank against the defendant.

Although the defendant claimed she was frightened of Frank and what he might do to her, she was in an unlocked house when Frank arrived at her farm. She admitted at trial that although one of her doors could not be locked from the inside, it could be secured from the outside, and one could then enter the house and secure the second door from the inside. However, she claimed that this never occurred to her.

The defendant had available nonlethal means to repel Frank's alleged attack, but declined to use them. She shot a man a total of three times, twice in the back, while he was carrying "something," which later proved to be a sack of lunchmeat.

Although Frank lay bleeding on her floor for almost an hour before help arrived, Thompson did not know where or how many times she had shot him. The only assistance she had rendered was to put a pillow under Frank's head and to give him a glass of water.

Finally, the defendant herself stated to the sheriff, "*Maybe he wouldn't have done anything to me*, but I have read where women waited too long to defend or protect themselves." (Emphasis supplied.) Such a statement does not reflect even a bare belief by the defendant that she was in danger of death or bodily harm. At most, it indicates that the defendant *did not know* whether Frank would hurt her or not, and it falls far short of the requirement that one must have a reasonable and good faith belief in the necessity to use deadly force for self-defense.

It is obvious that in this case the jury found that Thompson's claim of self-defense in the killing of Frank was not credible or reasonable.

The evidence is more than sufficient to support the jury's verdicts on both the first degree murder charge and the firearm charge. We find no plain error in this regard.

### SEQUESTERED, INDIVIDUAL VOIR DIRE

Finally, Thompson claims that the district court erred in failing to permit limited, sequestered voir dire of the venire. Prior to trial, Thompson moved for limited, sequestered, and individual voir dire of prospective jurors on the issues of knowledge of the case, knowledge of the defendant, knowledge of the decedent, and opinions about guilt or innocence,

necessitated by inflammatory and highly prejudicial pretrial publicity and the widespread community discussion of the killing.

In support of her motion, Thompson presented copies of numerous newspaper articles from towns in Knox County and the surrounding area. These articles were factual in nature. One article, in listing Frank's survivors, made reference to his "dear mother, Mrs. Mamie Frank." Another article consisted of a letter to the editor commenting on two recent killings in the community, and the editor's response, neither of which mentioned Thompson or Frank by name. The letter commended the editor for covering the story about "a man . . . killed by a woman near Verdigre" in an impersonal and appropriate way. The editor responded in part:

> We report what we know are facts. The emotions in that case are: We are very sorry for the mother of the deceased. She is a true gem - a very, very outstanding, sincere, and honest person who doesn't deserve to be a part of this tragedy, either. That's our emotions. The facts will come out during the trial which has been postponed until June.

These sympathetic references to an elderly woman in the community do not strike us as being inflammatory or prejudicial to the defendant.

Thompson also submitted affidavits from local residents that there were strong opinions held in the case and opining that the selection of a fair and impartial jury would be difficult. A jury selection expert hired by Thompson submitted an affidavit, based on an attitudinal survey of 36 randomly selected potential jurors in Knox County, that there was a significant subset of potential jurors who could not fairly decide the case because they had knowledge of the case through community discussion and had already formed opinions about the case. She conceded, however, that a fair and impartial jury could be found in Knox County.

Thompson argues that the lack of sequestered, individual voir dire prevented her from ascertaining the true extent of pertinent knowledge and opinions of potential jurors and that she was prejudiced thereby. The record reflects that the trial court conducted a thorough examination of prospective jurors

as to their knowledge of the case, whether they had formed an opinion about Thompson's guilt or innocence, and whether they could set aside any preconceived opinions and decide the case solely on the evidence. Only 3 individuals from a venire of 42 indicated that they did not feel they could set aside their previously formed opinions and render a verdict based solely upon the facts of the case, and those 3 individuals were excused for cause. This is inconsistent with the notion that a biased jury was seated. See *State v. Tucker*, 242 Neb. 336, 494 N.W.2d 572 (1993).

Except when there is a showing that without sequestration a party's rights would be prejudiced, a party has no right to examine a venireperson out of the presence of all other venirepersons. *State v. Bradley*, 236 Neb. 371, 461 N.W.2d 524 (1990), *cert. denied* ____ U.S. ____, 112 S. Ct. 143, 116 L. Ed. 2d 109 (1991).

The defendant has failed to show that a biased jury was seated or that she was prejudiced in any way by the district court's refusal to grant her motion for sequestered, individual voir dire. Her own jury selection expert conceded that it was possible to select a fair and impartial jury in Knox County. No error has been demonstrated by the trial court's refusal to grant sequestered, individual voir dire of each person called to sit as a juror in this case.

## CONCLUSION

This court having found no merit to any of the defendant's assignments of error, her convictions and sentences are affirmed.

AFFIRMED.

CAPORALE, J., not participating.