Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
04/03/2026 08:07 AM CDT

State of Nebraska, appellee, v.
Brent P. Lopez, appellant.

___ N.W.3d ___

Filed April 3, 2026.    No. S-24-504.

1. **Jury Instructions.** Whether jury instructions given by a trial court are correct is a question of law.
2. **Sentences: Appeal and Error.** An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court.
3. **Effectiveness of Counsel: Appeal and Error.** Whether a claim of ineffective assistance of counsel may be determined on direct appeal is a question of law.
4. ____: ____. In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance.
5. **Self-Defense.** In Nebraska, self-defense and defense of others are both statutorily defined affirmative defenses.
6. ____. To successfully assert the claim of self-defense under Neb. Rev. Stat. § 28-1409 (Reissue 2016), a defendant must have a reasonable and good faith belief in the necessity of using force and the force used in defense must be immediately necessary and justified under the circumstances.
7. **Self-Defense: Evidence.** When a defendant claims the use of deadly force was justified under Neb. Rev. Stat. § 28-1409(4) (Reissue 2016), there must be evidence that the defendant had a reasonable and good faith belief in the necessity to use deadly force.
8. **Self-Defense: Jury Instructions: Evidence.** To warrant an instruction on self-defense, it is not enough to show that the defendant subjectively believed in the need to use force for self-protection; the defendant must produce evidence that this subjective belief was also objectively reasonable.

9. **Self-Defense: Jury Instructions.** A defendant who is the initial aggressor is not entitled to a self-defense instruction. Stated differently, it is an essential element of a self-defense claim that the victim was the first aggressor.

10. **Self-Defense: Evidence: Proof.** Since justification is an affirmative defense, the defendant bears the initial burden to produce evidence that supports the claimed defense, and once the defendant has produced sufficient evidence to raise the defense, the issue becomes an element the State is required to disprove.

11. ____: ____: ____. A criminal defendant need only adduce a slight amount of evidence to satisfy the initial burden of raising the issue of self-defense.

12. **Self-Defense: Trial: Evidence: Proof.** The evidence necessary to raise an affirmative defense may be adduced either by the defendant's witnesses or in the State's case in chief without the necessity of the defendant's presenting evidence.

13. **Self-Defense: Jury Instructions: Evidence.** A trial court must instruct the jury on self-defense when there is any evidence adduced which raises a legally cognizable claim of self-defense.

14. **Self-Defense: Jury Instructions.** Only where the jury could reasonably find that the defendant's use of force was justified should the trial court instruct the jury on self-defense.

15. **Self-Defense: Jury Instructions: Evidence.** To support giving a justification instruction, there must be at least some evidence from which a reasonable jury could find that each element of the justification defense has been met.

16. ____: ____: ____. It is only when the evidence does not support a legally cognizable claim of self-defense, or when the evidence is so lacking in probative value that it constitutes a failure of proof regarding one or more elements of the defense, that a trial court may properly refuse to instruct a jury on a defendant's theory of self-defense.

17. **Self-Defense: Evidence.** To determine if there is sufficient evidence to support a legally cognizable claim of self-defense, the trial court must assess the evidence without deciding factual issues.

18. **Self-Defense: Juries.** The jury, and not the trial court, must resolve any fact questions concerning whether a defendant acted in self-defense within the meaning of the law.

19. **Self-Defense: Evidence.** Whether the evidence is sufficient to raise a legally cognizable claim of self-defense is, in the first instance, a question of law for the trial court.

20. **Self-Defense.** A person has no legal right to shoot another on sight merely because of a suspicion that the other person carries a gun.

21. \_\_\_\_. The mere display of a gun, without more, does not constitute the use of deadly force.

22. **Sentences: Appeal and Error.** Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors and applicable legal principles.

23. \_\_\_\_: \_\_\_\_. An abuse of discretion takes place when the sentencing court's reasons or rulings are clearly untenable and unfairly deprive a litigant of a substantial right and a just result.

24. **Sentences.** When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime.

25. \_\_\_\_. The appropriateness of a sentence is necessarily a subjective judgment that includes the sentencing judge's observation of the defendant's demeanor and attitude and of all the facts and circumstances surrounding the defendant's life.

26. **Sentences: Appeal and Error.** It is not the proper function of an appellate court to conduct a de novo review or engage in a reweighing of the sentencing factors in the record.

27. **Effectiveness of Counsel: Proof.** Generally, to prevail on a claim of ineffective assistance of counsel under the framework established by the U.S. Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense.

28. \_\_\_\_: \_\_\_\_. To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law.

29. **Trial: Attorneys at Law: Effectiveness of Counsel: Presumptions: Appeal and Error.** Trial counsel is afforded due deference to formulate trial strategy and tactics and, in considering a claim of ineffective assistance of counsel, there is a strong presumption that counsel acted reasonably.

30. **Trial: Attorneys at Law: Effectiveness of Counsel: Appeal and Error.** An appellate court will not second-guess the reasonable strategic decisions of trial counsel.

31. **Effectiveness of Counsel: Proof.** To show prejudice in a claim of ineffective assistance of counsel, the defendant must demonstrate a

reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.

32. **Words and Phrases.** A reasonable probability of prejudice is a probability sufficient to undermine confidence in the outcome.

33. **Effectiveness of Counsel: Appeal and Error.** In determining whether there is a reasonable probability that any deficient performance of trial counsel would have resulted in a different outcome in the proceeding, an appellate court may properly consider the strength of the admissible evidence relating to the controverted issues in the case.

34. ____: ____. When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must properly raise on direct appeal any issue of trial counsel's deficient performance which is either known to the defendant or is apparent from the record. Any known or apparent issue of deficient performance not properly raised on direct appeal will be procedurally barred in a subsequent postconviction proceeding.

35. **Appeal and Error.** An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court.

36. **Effectiveness of Counsel: Appeal and Error.** A defendant seeking to raise a claim of ineffective assistance of counsel on direct appeal is not required to make specific allegations of prejudice. However, anytime a defendant seeks to raise an ineffective assistance claim, whether on direct appeal or in a postconviction motion, the defendant must specifically assign and specifically argue the alleged deficient performance, and must do so with sufficient particularity.

37. ____: ____. To sufficiently allege deficient performance of counsel, the allegations must include a description of the specific conduct alleged to constitute deficient performance.

38. **Effectiveness of Counsel: Records: Appeal and Error.** The description of deficient performance of counsel must be particular enough to (1) allow an appellate court to determine whether the claim can be decided upon the trial record and (2) allow a district court reviewing a later postconviction motion to recognize whether the claim was raised on direct appeal.

39. **Effectiveness of Counsel: Appeal and Error.** To allege deficient conduct of counsel with specificity requires more than generalities of inadequate preparation or failures to introduce beneficial evidence.

40. **Effectiveness of Counsel: Records: Appeal and Error.** The fact that a claim of ineffective assistance of counsel is properly raised on direct appeal does not mean it can be resolved on direct appeal. The

determining factor is whether all the facts necessary to the analysis are part of the appellate record.

41. ____: ____: ____. An ineffective assistance of counsel claim will not be addressed on direct appeal if it requires examination of facts not contained in the record.

42. **Trial: Attorneys at Law: Effectiveness of Counsel: Records: Appeal and Error.** If the record on direct appeal conclusively establishes both that trial counsel's performance was deficient and that the deficient performance prejudiced the defendant's defense, an appellate court can determine trial counsel was ineffective. Conversely, if the record on direct appeal conclusively establishes either that trial counsel's performance was not deficient or that any deficient performance did not prejudice the defendant's defense, an appellate court can determine trial counsel was not ineffective.

43. **Effectiveness of Counsel: Records: Appeal and Error.** If the record on direct appeal does not conclusively establish or refute a claim of ineffective assistance, then the issue cannot be resolved on direct appeal and must be properly raised in a subsequent postconviction proceeding.

44. **Trial: Constitutional Law: Testimony: Attorney and Client: Waiver.** A defendant has a fundamental constitutional right to testify, and the right to testify is personal to the defendant and cannot be waived by defense counsel's acting alone.

45. **Trial: Attorney and Client: Testimony.** Defense counsel bears the primary responsibility for advising a defendant of his or her right to testify or not to testify, of the strategic implications of each choice, and that the choice is ultimately for the defendant to make.

46. **Trial: Attorney and Client: Effectiveness of Counsel: Testimony: Waiver.** Defense counsel's advice to waive the right to testify can present a valid claim of ineffective assistance of counsel in two instances: (1) if the defendant shows that counsel interfered with his or her freedom to decide to testify or (2) if counsel's tactical advice to waive the right was unreasonable.

Appeal from the District Court for Lancaster County: Kevin R. McManaman, Judge. Affirmed.

Kristi J. Egger, Lancaster County Public Defender, and Amanda R. Baskin for appellant.

Michael T. Hilgers, Attorney General, and Jacob M. Waggoner for appellee.

Funke, C.J., Miller-Lerman, Cassel, Stacy, Papik, Freudenberg, and Bergevin, JJ.

Stacy, J.

In September 2023, Brent P. Lopez fired gunshots at two social workers as they approached his home. A jury convicted him of multiple felonies relating to the shooting, and he was sentenced to consecutive prison terms. In this direct appeal, Lopez challenges the district court's refusal to instruct the jury on self-defense and/or defense of others, and he challenges his sentences as excessive. He also asserts that his trial counsel was constitutionally ineffective in several respects. We affirm his convictions and sentences.

## I. BACKGROUND

In November 2023, the State filed a six-count information against Lopez in the district court for Lancaster County. Count 1 alleged first degree assault (a Class II felony); count 2 alleged use of a firearm to commit a felony (a Class IC felony); count 3 alleged attempted first degree assault (a Class IIA felony); count 4 alleged use of a firearm to commit a felony (a Class IC felony); and counts 5 and 6 each alleged third degree assault (a Class I misdemeanor). The two misdemeanor assault charges were related to a physical altercation between Lopez and two teenage girls that occurred on September 24, 2023, at a community center where Lopez worked. The four felony charges related to a shooting that occurred 2 days later outside Lopez' home. Lopez pled not guilty to all charges, and a jury trial was scheduled.

Immediately before jury selection began, Lopez pled no contest to the misdemeanor charges, and the jury trial proceeded on the remaining felony charges. During the 5-day jury trial, 16 witnesses testified and more than 90 exhibits were offered. Lopez waived his right to testify. As relevant to the issues raised on appeal, we summarize the trial evidence, describing the various events in chronological order.

## 1. Events of September 24, 2023

On September 24, 2023, Lopez was working at a community center in Lincoln, Nebraska, that the parties refer to as the "rec center." Lopez' 12-year-old son was also at the rec center that day, and the son told Lopez that two 14-year-old girls had pushed and threatened him. Lopez confronted the girls and asked them to leave the rec center. When they refused, Lopez contacted police.

While waiting for police to arrive, Lopez got into a physical altercation with the girls in the lobby area of the rec center, and punches were thrown. The altercation lasted several minutes but was over by the time police arrived. Video footage of the altercation was captured on the rec center's security cameras.

After police investigated the altercation and reviewed the security footage, they cited Lopez for assaulting both girls. These citations gave rise to the misdemeanor assault charges to which Lopez eventually pled no contest. After issuing the citations, police escorted Lopez to his vehicle in the rec center's parking lot.

By this time, a group of approximately 10-15 people had gathered in the rec center's parking lot, and some in the group shouted derogatory comments at Lopez and at police. Police body cameras captured some of those comments. Comments directed at Lopez included, "You gonna get what you deserve," "[w]e know where this guy lives," and "[w]hen I see your little son . . . I'm not caring." Lopez responded to the group with comments like, "Make sure I don't see you first, chump," and "I got one too, come see me." An unidentified man kicked the side of Lopez' vehicle while Lopez and his son were seated inside, and some people in the group expressed frustration that Lopez had not been taken into custody. Additional officers were called to the scene to assist with crowd control.

Eventually, officers handcuffed Lopez and placed him in the back of a police cruiser, prompting members of the group

to cheer. While Lopez was seated in the back of the police cruiser, an officer told him:

> So, my issue is, is that everybody is pretty pissed off with this entire situation right now, and it's probably not going to be done tonight. So as soon as somebody . . . sees us let you out of a cop car, instead of taking you to jail, there's probably going to be more.

To avoid escalating the situation, officers drove away from the rec center with Lopez in the back of the police cruiser. Police then released Lopez several blocks away at a prearranged location, where Lopez was picked up by his neighbor and driven home.

## 2. EVENTS OF SEPTEMBER 25, 2023

### (a) Media Coverage

The next day, local media reported on Lopez' involvement in the altercation at the rec center, and several related cell phone videos were posted online. At trial, Lopez' oldest son, the only member of the Lopez family to testify at trial, testified about his father's response to the media coverage. The son, who was 15 years old at the time of trial and 14 years old when the crimes occurred, testified that his father perceived the media coverage to be

> painting his situation in a negative and false light. . . . He also had a lot of fear after the [media coverage.]
>
> . . . .
>
> . . . [H]e was worried about people around the city viewing that and being outraged, rightfully so. And that instilled a lot of fear because he wasn't sure if people were going to find out where we lived, if they were going to track us down, you know, if he could even go outside. He was fearful, and not only for him but for our entire family.

The son testified that he and his two younger brothers were frightened too. He said that Lopez had instructed them to stay away from windows while inside the home and that they

were scared to be outside. The son searched online for posts about the altercation at the rec center, and he helped Lopez monitor the online comments to those posts. The son testified that he saw "a lot of outrage" in the online comments, but he admitted that none of the comments contained threats directed at either Lopez or his family. The son also testified that, at his father's direction, he helped produce several videos in a series titled "Brent Lopez Vs. The City of Lincoln" and posted those videos online so that Lopez could "give his side of the story" regarding the altercation at the rec center.

### (b) First Welfare Check

The morning after the altercation at the rec center, Lopez advised his youngest son's elementary school that the boy would not be attending school because his family "fear[ed] for their li[ves]." Lopez told the school that "70 to 100 people were trying to get him" and that he "had a gun and had been watching at the window all night." The school registrar called police and requested a welfare check on Lopez' son.

Police then called Lopez to inform him they were coming to his home to conduct a welfare check. When two uniformed officers arrived, Lopez reported that he did not feel safe in his home based on the reaction of the crowd at the rec center the previous day. He told the officers that "at least 50 people [were] screaming [I'm] going to kill you" and "one of them walked up and let me know she knows where I live." One of the officers testified that Lopez was not able to identify anyone in the crowd who made the threatening comments and that Lopez expressly denied receiving additional threats after leaving the rec center's parking lot. Lopez told the officers that he was planning to pull his children from school and that they were "gonna get out of here" due to safety concerns. The officers provided Lopez with information about available resources if he decided to "leave town," and they encouraged Lopez to contact police "if people do show up."

### 3. Events of September 26, 2023

#### (a) Second Welfare Check

Two days after the altercation at the rec center, police conducted a second welfare check at Lopez' home. This welfare check was prompted by a call to police from the mother of Lopez' children, who reported she was concerned about the children's well-being after seeing the media coverage of the altercation at the rec center. When police arrived at Lopez' home to conduct this welfare check, Lopez said he was packing up the house to move his family because "my life's in danger." An officer asked Lopez why he was in danger, and he replied, "Because the media's got me on as beating up a bunch of kids at the rec center when I was getting jumped." When the officer asked Lopez to identify who was threatening him, Lopez replied, "The angry mob that was threatening to kill me."

The officer testified that Lopez was "showing signs of paranoia" and "maybe fear of retaliation," but because Lopez had not reported any specific threats, the officer concluded there was little that police could do. After talking with Lopez for several minutes, the officer determined he was not a threat to himself or others and there was no need to remove the children from the home. Before leaving, the officer told Lopez, "If you need us, just call us."

#### (b) Home Visit

Later that same day, the Nebraska Department of Health and Human Services (DHHS) received a call on its hotline from the children's mother reporting possible abuse and neglect of the children by Lopez. The report was assigned to DHHS employee Caden Dirks.

As part of his initial investigation, Dirks contacted the police department's family crimes unit and learned that police had just been out to Lopez' home for a welfare check and "everything seemed good." Dirks and another DHHS employee

then drove a government vehicle to Lopez' home to continue the investigation. According to Dirks, it was standard DHHS procedure not to call ahead to alert a caregiver of a home visit when investigating possible abuse or neglect, so neither Dirks nor his coworker alerted Lopez of their visit.

At approximately 4 p.m., the DHHS employees arrived at Lopez' home and parked their vehicle along the curb across the street. It is undisputed that their vehicle was marked on both sides with a "State of Nebraska Dept. of Administrative Services" logo. Both DHHS employees were dressed in casual attire, and neither was armed. Dirks was wearing a lanyard around his neck that displayed his DHHS badge, and he was carrying under his left arm a black zippered binder with paperwork visible in the front pocket of the binder.

### (i) Oldest Son's Testimony

When the DHHS employees arrived at Lopez' home, Lopez' oldest son was standing on the front porch and his youngest son was riding a scooter on the sidewalk near the home. The oldest son testified that he did not see the vehicle pull up, but he noticed two men sitting in a parked vehicle across the street, talking and glancing at the home. He did not notice the government logo on the vehicle, but he explained he was not wearing his eyeglasses at the time and, consequently, objects at a distance were "not so clear." On cross-examination, the son admitted that without his eyeglasses, he "can't really discern much at all."

The son testified that he watched as the men got out of the vehicle and began walking "swiftly" toward the home. He noticed one man was "holding something," and he watched the man move the object from one hand to the other after he got out of the vehicle. The son testified the man was holding "the object, whatever it was, like he would be holding a handgun. It was directly down to the ground." The son testified that "in my head, it all came together and I just — I panicked." Believing "the man was holding . . . a gun in its

holster," the son ran inside the home and told Lopez: "[M]en are coming and they have a gun, and they're coming towards the house."

The son testified that in response to this statement, Lopez commanded him to "get away from the door." The son watched as Lopez opened the door, raised a firearm, and shot twice toward the approaching men. When the men began screaming for help, the son testified that he could see on Lopez' face that he "went from believing it was a threat to realizing that it wasn't." Lopez apologized to the men and assured them help was on the way. After police and emergency responders arrived, Dirks was transported to a hospital where he was treated for a gunshot wound that entered the back of his leg near his buttocks and exited the front of his thigh.

### (ii) Dirks' Testimony

Dirks testified to a similar series of events. He said that after parking the government vehicle across the street from Lopez' home, he and his coworker got out of the vehicle and began walking toward Lopez' home. Dirks was carrying a binder in his left arm at hip level, with his paperwork facing outward. As the men approached the home, they saw an older child on the front porch who, upon seeing them, screamed "run" and ran inside the home. Dirks did not think anything of it at the time because, in his experience, it was not uncommon for children to run when DHHS employees arrived at their home. Dirks crossed the street, stepped up onto the curb in front of Lopez' home, and approached the sidewalk area when Lopez opened the front door and began shooting without warning.

Both DHHS employees turned to run, and Dirks was shot in the back of the leg. The employees retreated behind their parked vehicle, where Dirks' coworker began to render aid and called the 911 emergency dispatch service. Dirks testified

about a lengthy healing process from his gunshot wound and said he still experienced pain with prolonged standing.

### 4. POSTSHOOTING INVESTIGATION

Police testified that after the shooting, Lopez was cooperative and was taken into custody without incident. A videotaped interview of Lopez by police was admitted into evidence and played for the jury. In it, Lopez said to police, "Okay, this is what happened. I've been under threat of death for days now, in my opinion, in my full competent belief, because of what the police did." Lopez went on to describe how he thought police had mishandled the investigation at the rec center, and he said that "for three days nonstop," he had been worrying "people [were] going to try and kill us." Lopez described the shooting this way:

> I'm in the kitchen, and I hear my son go, "Dad, somebody's outside and they got a gun." . . . I run and I grab my gun, and I [told my son to] get away from the door . . . I look outside and two men, not in uniform, are walking towards my house, and they got something in their hands. At this point, I trusted my son because I had no choice. . . . I shot twice, and then I looked up and seen the car across the street, and it was some "Nebraska Department" of something . . . . I immediately call 911, . . . I'm praying for him, and I'm so sick that he's hurt right now. That is my statement.

After the shooting, police examined Lopez' cell phone and reviewed news articles, online comments, and social media accounts, looking for evidence of specific threats against Lopez. Other than the comments shouted from the group in the rec center parking lot, investigators found no evidence of any threat directed at either Lopez or his family.

### 5. JURY INSTRUCTION CONFERENCE

After both parties rested, the court held a formal jury instruction conference outside the presence of the jury. Lopez

asked for a jury instruction on self-defense and/or defense of others. In support, Lopez argued that he reasonably feared for his life after receiving threats from "an angry mob" at the rec center, and he argued that unfavorable media coverage in the days that followed the altercation gave him "a rational, subjective and objective belief that he was still in danger." Lopez argued that "[t]he law allows for someone to be mistaken if their mistake was reasonable [and it] should be for the jury to decide if [he] was reasonable or not when he fired that gun."

The State disagreed. It argued the evidence did not support a legally cognizable claim of self-defense because, even assuming Lopez may have subjectively believed that deadly force was necessary, he offered no evidence to show that his belief was objectively reasonable. The State emphasized evidence that the DHHS employees arrived at Lopez' home in a "government marked vehicle," walked up to the home carrying nothing but a black binder and a cell phone, and made no threatening comments or gestures as they approached. The State acknowledged the oldest son's statement that the men had a gun but argued it was not reasonable for Lopez to rely on that statement without verifying the circumstances for himself, especially since Lopez knew his son had impaired vision and Lopez could see that his son was not wearing his eyeglasses. Finally, the State emphasized that Lopez' own description of the events showed that he fired his gun and used deadly force before taking any steps to assess whether the approaching men posed an immediate threat of serious bodily harm.

The court refused to instruct on self-defense, giving two reasons for its decision. First, it relied on the rule that a defendant who is the initial aggressor is not entitled to a self-defense instruction.[1] The court concluded, based on the evidence,

---

[1] See, e.g., *State v. Miller*, 281 Neb. 343, 798 N.W.2d 827 (2011).

that Lopez was not just the first aggressor, he was "the only aggressor." Alternatively, the court concluded Lopez had "transfer[red] his fear of people at the rec center two days before to two innocent victims in front of his house" and it was "just not objectively reasonable" to believe the victims posed any threat at all.

### 6. Closing Arguments

In closing argument, the State's theory was that the shooting was motivated by "self-induced paranoia" over public reaction to events at the rec center several days earlier, causing Lopez to develop an irrational fear that people wanted to kill him. The State argued that Lopez brought his children in his "hyperbolized reality," and when the oldest son said that men were approaching the home with a gun, Lopez opened the front door and intentionally fired his gun directly at the men, only realizing after the fact that they were unarmed DHHS employees. The State asked the jury to return a verdict finding Lopez guilty of first degree assault for intentionally shooting Dirks and causing serious bodily injury. It also asked the jury to find Lopez guilty of attempted first degree assault for intentionally shooting at the other DHHS employee and guilty of the related charges for using a firearm to commit both assaults.

Defense counsel argued that the shooting did not occur because of "self-induced paranoia," but instead occurred because Lopez had been threatened at the rec center and was "moved to protect his family" from "the man who [his oldest son] believed had a gun." Defense counsel did not deny that Lopez intentionally fired two shots at Dirks, but he argued there was "no evidence that [Lopez] ever shot" in the direction of the other DHHS employee. Moreover, defense counsel argued that although one of the shots hit and injured Dirks, the gunshot wound was "not serious in nature" and, therefore, if Lopez was "guilty at all, it would be for third-degree assault [against] Dirks only." Finally, defense counsel argued that

a verdict finding Lopez guilty of third degree assault would require the jury to return "not guilty" verdicts on the related charges of using a firearm to commit a felony.

### 7. Verdict and Sentencing

On the charge of first degree assault for shooting Dirks, the jury returned a verdict finding Lopez guilty of the lesser-included offense of attempted assault in the first degree. On all remaining counts, the jury found Lopez guilty as charged. The court accepted the verdicts and found Lopez guilty of two counts of attempted first degree assault and two counts of using a firearm to commit a felony. The court ordered a presentence investigation report and set the matter for sentencing.

At the sentencing hearing, the court acknowledged receipt and consideration of the presentence investigation report. After considering the parties' arguments and giving Lopez an opportunity for allocution, the court pronounced prison sentences of 10 to 15 years on the conviction for attempted first degree assault against Dirks, 3 to 5 years on the conviction for attempted first degree assault against the other DHHS employee, and 5 to 10 years on each of the convictions for use of a firearm to commit a felony. On each of the two misdemeanor assault charges to which Lopez pled no contest before trial, the court pronounced a prison sentence of 1 year. All sentences were ordered to be served consecutively.

Lopez timely appealed, represented by new counsel. We moved this appeal to our docket on our own motion.

## II. ASSIGNMENTS OF ERROR

Lopez assigns that the district court erred in (1) refusing to instruct the jury on self-defense or defense of others and (2) imposing excessive sentences. In addition, Lopez asserts that his trial counsel was constitutionally ineffective in four respects: "failing to obtain exculpatory evidence regarding the rec center incident," advising Lopez not to testify and "failing to adequately prepare [him] to testify," "failing to adequately

investigate DHHS policy," and "failing to retain an expert to rebut the State's claim that [Lopez] was suffering from self-induced paranoia."

## III. STANDARD OF REVIEW

[1] Whether jury instructions given by a trial court are correct is a question of law.[2]

[2] An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court.[3]

[3,4] Whether a claim of ineffective assistance of counsel may be determined on direct appeal is a question of law.[4] In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance.[5]

## IV. ANALYSIS

### 1. Instruction on Self-Defense/Defense of Others

Lopez contends the trial court erred in refusing to instruct the jury on self-defense and/or defense of others. He argues the evidence presented a jury question regarding whether, "based on the information available to him in that instant,"[6] Lopez mistakenly, but reasonably, believed the DHHS employees "presented an immediate threat to him and/or his family when they approached his home with what [Lopez] believed was a firearm."[7]

---

[2] *State v. Gonzalez*, 313 Neb. 520, 985 N.W.2d 22 (2023).

[3] *State v. Rezac*, 318 Neb. 352, 15 N.W.3d 705 (2025).

[4] *State v. Dat*, 318 Neb. 311, 15 N.W.3d 410 (2025).

[5] See *id*.

[6] Brief for appellant at 27.

[7] *Id*.

To analyze his argument, we first review the statutory requirements for raising a claim of self-defense and defense of others under Nebraska law. We then review our case law addressing when a defendant is entitled to a jury instruction on self-defense or defense of others. And finally, we review the evidence and arguments in the instant appeal to determine whether, on this record, Lopez was entitled to a jury instruction on self-defense and/or defense of others.

### (a) Justification Defenses Under Nebraska Law

[5] In Nebraska, self-defense and defense of others are both statutorily defined affirmative defenses.[8] In asserting these defenses, Lopez relies exclusively on the justification provisions in §§ 28-1409 and 28-1410, and we limit our analysis accordingly.

### (i) Justification Based on Self-Defense

Section 28-1409(1) provides, in relevant part, that "the use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion." Section 28-1409(4) imposes additional requirements to justify the use of deadly force, providing the "use of deadly force shall not be justifiable under this section unless the actor believes that such force is necessary to protect himself against death, serious bodily harm, kidnapping or sexual intercourse compelled by force or threat." The justification statutes define "deadly force" to include "[p]urposely firing a firearm in the direction of another person."[9] On appeal, Lopez does not dispute that he used deadly force when he fired his gun in the direction of the DHHS employees as they approached his home.

---

[8] See, Neb. Rev. Stat. §§ 28-1409 and 28-1410 (Reissue 2016); *State v. Case*, 304 Neb. 829, 937 N.W.2d 216 (2020).

[9] Neb. Rev. Stat. § 28-1406(3) (Reissue 2016).

[6-8] This court has long interpreted § 28-1409 to mean that "to successfully assert the claim of self-defense, a defendant must have a reasonable and good faith belief in the necessity of using force and the force used in defense must be immediately necessary and justified under the circumstances."[10] Similarly, when a defendant claims the use of deadly force was justified, there must be evidence that the defendant had "a reasonable and good faith belief in the necessity to use deadly force."[11] The principle underpinning the requirement that a defendant's belief must be objectively reasonable "is that human life should not be made to depend upon conditions so unreliable and hazardous as the bare belief of any person that he or she is in danger of death or bodily harm."[12] As such, to warrant an instruction on self-defense, it is not enough to show that the defendant subjectively believed in the need to use force for self-protection; "the defendant must produce evidence that this subjective belief was also objectively reasonable."[13]

Moreover, when a defendant claims to have used deadly force in self-defense, the justification statutes impose additional requirements that the defendant cannot provoke the

---

[10] *State v. Johnson*, 314 Neb. 20, 42-43, 988 N.W.2d 159, 176 (2023). See, *State v. France*, 279 Neb. 49, 776 N.W.2d 510 (2009); *State v. Thompson*, 244 Neb. 375, 507 N.W.2d 253 (1993); *State v. Eagle Thunder*, 201 Neb. 206, 266 N.W.2d 755 (1978).

[11] *Thompson, supra* note 10, 244 Neb. at 405, 507 N.W.2d at 273. See, also, *State v. Williams*, 239 Neb. 985, 999, 480 N.W.2d 390, 400 (1992) (approving jury instruction stating that defendant must have "reasonably believed that his use of deadly force was immediately necessary to protect him against serious bodily harm").

[12] *Thompson, supra* note 10, 244 Neb. at 404, 507 N.W.2d at 273. Accord *Housh v. State*, 43 Neb. 163, 169, 61 N.W. 571, 573 (1895) ("'if the person charged with the homicide is to judge for himself whether the reasonable ground existed[,] the most atrocious murders may be committed with impunity'").

[13] *Johnson, supra* note 10, 314 Neb. at 43, 988 N.W.2d at 176.

use of force and must retreat before using deadly force under certain circumstances. Section 28-1409(4) states that the use of deadly force is not justifiable if the defendant "provoked the use of force against himself in the same encounter"[14] or if the defendant "knows that he can avoid the necessity of using [deadly] force with complete safety by retreating,"[15] except that a defendant "shall not be obliged to retreat from his dwelling . . . unless he was the initial aggressor."[16]

[9] In addition to these statutory elements regarding the use of deadly force in self-defense, Nebraska has long followed the rule that "'a defendant who is the initial aggressor is not entitled to a self-defense instruction.'"[17] Stated differently, it is an essential element of a self-defense claim that the victim was the first aggressor.[18]

### (ii) Justification Based on Defense of Others

Section 28-1410(1) provides, in relevant part, that the use of force to protect others is justifiable when:

(a) The actor would be justified under section 28-1409 in using such force to protect himself against the injury he believes to be threatened to the person whom he seeks to protect;

(b) Under the circumstances as the actor believes them to be, the person whom he seeks to protect would be justified in using such protective force; and

---

[14] § 28-1409(4)(a).

[15] § 28-1409(4)(b).

[16] § 28-1409(4)(b)(i).

[17] *State v. Liech, 320 Neb. 843, 854, 30 N.W.3d 847, 856 (2026)*. Accord, *State v. Valadez*, 313 Neb. 902, 987 N.W.2d 268 (2023); *Miller, supra* note 1. See *Eagle Thunder, supra* note 10.

[18] See, e.g., *Liech, supra* note 17, 320 Neb. at 854, 30 N.W.3d. at 856 ("determination of whether the victim was the first aggressor is an essential element of a self-defense claim"). Accord *State v. Kruger*, 320 Neb. 361, 27 N.W.3d 398 (2025) (same).

    (c) The actor believes that his intervention is necessary
for the protection of such other person.

Because it is a material element of a justification claim
under § 28-1410 that the defendant would be justified under
§ 28-1409 in "using such force to protect himself against
the injury he believes to be threatened"[19] against the one he
seeks to protect, our analysis will focus primarily on whether
Lopez produced sufficient evidence to raise a legally cogniza-
ble claim of self-defense involving the use of deadly force
under § 28-1409(4).

### (b) Burden of Proof and Duty to Instruct

[10-12] Since justification is an affirmative defense, the
defendant bears the initial burden to produce evidence that
supports the claimed defense,[20] and once the defendant has
produced sufficient evidence to raise the defense, the issue
becomes an element the State is required to disprove.[21] A crimi-
nal defendant "need only adduce a slight amount of evidence to
satisfy this initial burden of raising the issue of self-defense."[22]
And the evidence necessary to raise an affirmative defense
may be adduced either by the defendant's witnesses or in the
State's case in chief without the necessity of the defendant's
presenting evidence.[23] But as we explain next, even though the
initial burden requires only a slight amount of evidence, there
must be at least some evidence to support each element of the
claimed justification defense.

[13-16] We have often said that a trial court must instruct
the jury on self-defense "'when there is any evidence adduced

---

[19] § 28-1410(1)(a).

[20] See, *Liech, supra* note 17; *State v. Urbano*, 256 Neb. 194, 589 N.W.2d 144 (1999).

[21] See, *Liech, supra* note 17; *State v. Alford*, 278 Neb. 818, 774 N.W.2d 394 (2009).

[22] *State v. Kinser*, 252 Neb. 600, 607, 567 N.W.2d 287, 292 (1997).

[23] *Id*.

which raises a legally cognizable claim of self-defense.'"[24] Elaborating on this principle, we have explained that "only where the jury could *reasonably* find that the defendant's use of force was justified should the trial court instruct the jury on self-defense."[25] In other words, to support giving a justification instruction, there must be at least some evidence from which a reasonable jury could find that each element of the justification defense has been met.[26] It is only when the evidence does not support a legally cognizable claim of self-defense, or when the evidence is so lacking in probative value that it constitutes a failure of proof regarding one or more elements of the defense, that a trial court may properly refuse to instruct a jury on a defendant's theory of self-defense.[27]

[17-19] To determine if there is sufficient evidence to support a legally cognizable claim of self-defense, the trial court must assess the evidence "without deciding factual issues."[28]

---

[24] *Liech, supra* note 17, 320 Neb. at 853, 30 N.W.3d at 855. Accord, *Urbano, supra* note 20; *Kinser, supra* note 22. See *Case, supra* note 8.

[25] *Case, supra* note 8, 304 Neb. at 842, 937 N.W.2d at 225 (emphasis supplied).

[26] See, e.g., *People v. Dupree*, 486 Mich. 693, 712, 788 N.W.2d 399, 410 (2010) (defendant must satisfy "the initial burden of producing some evidence from which a jury could conclude that the elements necessary to establish a prima facie defense of self-defense exist"); *State v. Riley*, 137 Wash. 2d 904, 976 P.2d 624 (1999) (defendant bears initial burden of producing some evidence satisfying statutory elements of self-defense). See, also, 2 Paul H. Robinson & Catherine Palo, Criminal Law Defenses § 132 at 92 (Supp. 2025) (observing that if there is "some evidence to support each element of self-defense—whether found in the State's presentation of evidence or produced by the defendant—it becomes the State's burden to persuade the jury beyond a reasonable doubt that at least one element of the defense does not exist").

[27] See, *Case, supra* note 8; *Kinser, supra* note 22; *State v. Brown*, 235 Neb. 374, 382, 455 N.W.2d 547, 552 (1990) ("trial court is not required to give an instruction [on self-defense] where there is insufficient evidence to prove the facts claimed").

[28] See, *Case, supra* note 8, 304 Neb. at 843, 937 N.W.2d at 226.

This is because the jury, and not the trial court, must resolve any fact questions concerning whether a defendant acted in self-defense within the meaning of the law.[29] But whether the evidence is sufficient to raise a legally cognizable claim of self-defense is, in the first instance, a question of law for the trial court.[30]

With these principles in mind, we turn to the parties' arguments and consider whether, on this record, Lopez met his initial burden of producing sufficient evidence to raise a legally cognizable claim of self-defense or defense of others.

### (c) Parties' Arguments

At the conclusion of all the evidence, the district court ruled that Lopez had not raised a legally cognizable claim of self-defense because (1) the undisputed evidence showed Lopez was the initial aggressor and the DHHS employees had not actually threatened the use of any force and (2) there was no evidence to support a finding that Lopez had a reasonable and good faith belief in the necessity of using deadly force.

Lopez argues the district court's ruling was erroneous in both respects. He concedes, as he must, that the undisputed evidence showed that the DHHS employees presented "no

---

[29] See, *Liech, supra* note 17; *Kinser, supra* note 22, 252 Neb. at 609, 567 N.W.2d at 293 (noting "[a] defendant's claim of self-defense is a question of fact for the jury" and "a jury, and not the trial court, must resolve" fact questions concerning whether defendant acted in self-defense).

[30] See, *Case, supra* note 8; *Kinser, supra* note 22. Accord, *Dykes v. State*, 319 Md. 206, 221, 571 A.2d 1251, 1259 (1990) ("[t]he threshold determination whether the evidence was sufficient to generate the doctrine of self-defense was a question of law for the judge"); *State v. Badgett*, 167 N.W.2d 680, 683 (Iowa 1969) (whether evidence is "sufficient to justify a killing in self-defense is usually a question of law for the trial court, but whether such facts exist is generally a question for the jury"); 41 C.J.S. *Homicide* § 492 at 256 (2025) (noting defense of justification generally raises questions of fact for jury on sufficient evidence, "but a question of law is presented for the court in the absence of evidence to support the defense or when the facts are undisputed").

actual threat of harm"[31] to either Lopez or his children and that Lopez was the first person, and the only person, to use deadly force that day. But Lopez argues the evidence showed that he "mistakenly believed that [the DHHS employees] were the initial aggressors, presenting an immediate risk of serious bodily injury or death to [Lopez] and his three minor children."[32] And he argues this presented a jury question regarding whether his mistaken belief was reasonable under the circumstances.

In making this argument, Lopez relies on the rule that "[a] defendant's use of deadly force in self-defense is justified if a reasonable ground existed under the circumstances for the defendant's belief that he or she was threatened with death or serious bodily harm, *even if the defendant was actually mistaken about the extent of the danger*."[33] Lopez argues he presented evidence of two circumstances that showed it was reasonable for him to believe the men approaching his home were armed and presented an imminent threat of death or serious bodily harm: (1) "an angry mob"[34] had threatened him with harm at the rec center several days earlier and (2) just moments before the shooting, Lopez' son "ran into the house 'panicked for his life' and warned [Lopez] that two men were coming toward the house with a gun."[35] According to Lopez, if the jury believed this evidence, it would have allowed a finding that his use of deadly force was reasonable under the circumstances, even though he was mistaken about the extent of the danger.

The State disagrees and argues that it was not objectively reasonable for Lopez to believe that either his life or his

---

[31] Brief for appellant at 31.

[32] Id. at 27-28.

[33] *Miller, supra* note 1, 281 Neb. at 348, 798 N.W.2d at 831 (emphasis supplied).

[34] Brief for appellant at 28.

[35] *Id*. at 29.

children's lives were in imminent danger based on events at the rec center 2 days earlier. Additionally, the State argues it was not reasonable for Lopez "to rely solely on [his son's] representation that two men were approaching the house with a gun,"[36] especially when Lopez could see that his son was not wearing his eyeglasses.

In sum, we understand Lopez to argue that he produced at least some evidence that it was reasonable for him to believe that armed men were approaching his home to cause serious bodily harm to him and/or his children and that therefore, the issue of whether his subjective belief was reasonable should have been presented to the jury. And we understand the State to contend that the evidence Lopez relied on to support a reasonable and good faith belief in the necessity of using deadly force was so lacking in probative value that it constituted a complete failure of proof on that issue.

We ultimately conclude there was a failure of proof to support a reasonable belief in the immediate necessity of using deadly force, but our reasoning differs from that advanced by the parties.

(d) No Evidence to Support Reasonable Belief
in Immediate Necessity to Use Deadly Force

Lopez does not contend there was evidence that the DHHS employees did or said anything as they approached the home that posed a threat of death or serious bodily harm, but he argues it was reasonable for him to connect the approaching men with threats of harm shouted by members of the group at the rec center a few days earlier. In *State v. Goynes*,[37] we observed that other courts allow evidence of third-party threats to support a claim of self-defense if there is also evidence from

---

[36] Brief for appellee at 22.

[37] *State v. Goynes*, 278 Neb. 230, 768 N.W.2d 458 (2009).

which the jury could find that the defendant reasonably connected the victim with those third-party threats.[38]

On this record, we question whether there was any evidence that would allow a jury to conclude it was reasonable for Lopez to connect the victims in this case with third-party threats shouted by unidentified people at the rec center several days earlier.[39] But ultimately, we need not decide that question, because even assuming arguendo that a jury could find it was reasonable for Lopez to connect the approaching men with the third-party threats, and even assuming that a jury could also find it was reasonable for Lopez to rely on his son's representation that the approaching men possessed a gun, there was still a failure to adduce any evidence supporting a reasonable and good faith belief in the necessity to use deadly force against the approaching men.

The premise of Lopez' argument is that it was immediately necessary for him to use deadly force against the approaching men because he believed they had a gun. To the extent Lopez equates the mere possession of a gun with the threatened use of deadly force, he is not on solid legal footing.

[20,21] In *Bell v. State*,[40] we held that "a man has no legal right to shoot another on sight merely because he suspects that the other man carries a gun, even though the other man may at some time have threatened to shoot and kill him." Speaking to the same point, a leading criminal treatise notes that even "[a] defendant, who anticipates that the victim intends to kill him if and when the opportunity presents itself . . . is required to wait until the victim performs some act indicating that a

---

[38] *Id.*

[39] See 2 Wayne R. LaFave, Substantive Criminal Law § 10.4(c) at 22 (3d ed. Supp. 2025) (noting that when assessing defendant's reasonable belief in necessity of using force in self-defense, "the defendant's idiosyncratic beliefs and considerations, such as their irrational beliefs regarding dangerousness, should not be considered").

[40] *Bell v. State*, 159 Neb. 474, 481, 67 N.W.2d 762, 767 (1954).

homicidal attack is imminent."[41] The "mere display of a gun without more does not constitute [the use of] deadly force."[42]

To be entitled to a jury instruction on the use of deadly force in self-defense or defense of others, Lopez was required to produce at least some evidence that would support a finding that he had "a reasonable and good faith belief in the [immediate] necessity to use deadly force."[43] Lopez arguably presented evidence that he believed the men approaching his home were angry with him for assaulting teenagers and that he believed the men had a gun, but Lopez failed to present any evidence that would allow a jury to find that the approaching men did anything, or said anything, that could reasonably be construed as presenting an imminent threat of death or serious bodily harm to Lopez or his family. Even if the circumstances had been just as Lopez mistakenly believed them to be, he would not have been justified in using deadly force.

Because the record contains no evidence to support a finding that Lopez had a reasonable and good faith belief in the immediate necessity of using deadly force against the DHHS employees, there was a failure of proof regarding one or more elements of the defense, and the trial court properly refused to instruct the jury on self-defense and defense of others.[44] There is no merit to Lopez' first assignment of error.

---

[41] 1 Jens David Ohlin, Wharton's Criminal Law § 14:4 (Sept. 2025 update).

[42] *Stewart v. State*, 672 So. 2d 865, 868 (Fla. App. 1996). Accord *Cole Estate of Richards v. Hutchins*, 959 F.3d 1127, 1132 (8th Cir. 2020) (mere possession of firearm by individual is generally not enough to support officer's reasonable belief that individual poses immediate threat of death or serious bodily injury unless individual "also point[s] the firearm at another individual or take[s] similar 'menacing action'"). See, also, § 28-1406(3) (defining "deadly force" to exclude mere production of weapon).

[43] *Thompson, supra* note 10, 244 Neb. at 405, 507 N.W.2d at 273; *Williams, supra* note 11.

[44] See, *Case, supra* note 8; *Kinser, supra* note 22; *Brown, supra* note 27.

## 2. Excessive Sentences

In his second assignment of error, Lopez contends that his sentences were excessive. The sentences imposed were all within statutory limits,[45] and Lopez does not contend otherwise.

[22,23] Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors and applicable legal principles.[46] An abuse of discretion takes place when the sentencing court's reasons or rulings are clearly untenable and unfairly deprive a litigant of a substantial right and a just result.[47]

[24,25] When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime.[48] We have acknowledged that while these factors should instruct a sentencing court, they do not comprise a mathematical formula that must be rigidly implemented, and that a sentence should be tailored and based on factors that fit the offender and not merely the crime.[49] The appropriateness of a sentence is necessarily a subjective judgment that includes the sentencing judge's observation of the defendant's demeanor and attitude and of all the facts and circumstances surrounding the defendant's life.[50]

---

[45] See Neb. Rev. Stat. §§ 28-105 (Cum. Supp. 2024) and 28-106 (Reissue 2016).

[46] See *Liech, supra* note 17.

[47] *Id.*; *State v. Alkazahy*, 314 Neb. 406, 990 N.W.2d 740 (2023); *State v. Starks*, 308 Neb. 527, 955 N.W.2d 313 (2021).

[48] See, *Alkazahy, supra* note 47; *Starks, supra* note 47.

[49] *State v. Ezell*, 314 Neb. 825, 993 N.W.2d 449 (2023).

[50] *Starks, supra* note 47.

[26] Lopez does not contend the court failed to consider these factors or that it considered any improper factors. Instead, he argues the court "failed to give adequate weight"[51] to several factors. But it is not the proper function of an appellate court to conduct a de novo review or engage in a reweighing of the sentencing factors in the record.[52] Because we can find no abuse of discretion in the sentences imposed, we reject Lopez' second assignment of error.

### 3. Ineffective Assistance of Counsel

Represented by new counsel on direct appeal, Lopez asserts four separate claims that his trial counsel was constitutionally ineffective. All of Lopez' claims are governed by the general legal principles that apply to claims of ineffective assistance of counsel, and, because the claims are being raised on direct appeal, they are also subject to additional requirements. We review the governing principles and requirements before examining Lopez' claims.

### (a) General Ineffective Assistance of Counsel Principles

[27-30] Generally, to prevail on a claim of ineffective assistance of counsel under the framework established by the U.S. Supreme Court in *Strickland v. Washington*,[53] the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defense.[54] To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in

---

[51] Brief for appellant at 33.

[52] *Liech, supra* note 17. See *Starks, supra* note 47.

[53] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

[54] E.g., *State v. Hagens*, 320 Neb. 65, 26 N.W.3d 174 (2025).

criminal law.[55] Trial counsel is afforded due deference to formulate trial strategy and tactics and, in considering a claim of ineffective assistance of counsel, there is a strong presumption that counsel acted reasonably.[56] Thus, an appellate court will not second-guess the reasonable strategic decisions of trial counsel.[57]

[31-33] To show prejudice in a claim of ineffective assistance of counsel, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.[58] A reasonable probability of prejudice is a probability sufficient to undermine confidence in the outcome.[59] In determining whether there is a reasonable probability that any deficient performance of trial counsel would have resulted in a different outcome in the proceeding, an appellate court may properly consider the strength of the admissible evidence relating to the controverted issues in the case.[60]

### (b) Specific Requirements for Raising Ineffective Assistance of Counsel Claims on Direct Appeal

The need for finality in the criminal process generally requires that a defendant bring all claims for relief at the first opportunity.[61] Our cases hold that when a defendant is represented by the same lawyers at trial and on direct appeal, the defendant's first opportunity to assert claims of ineffective

---

[55] *Id*.

[56] See, e.g., *State v. Corral*, 318 Neb. 940, 20 N.W.3d 372 (2025).

[57] See *id*.

[58] E.g., *Hagens, supra* note 54.

[59] See *id.*

[60] *Kruger, supra* note 18; *State v. Vazquez*, 319 Neb. 192, 21 N.W.2d 615 (2025). See, also, *Strickland, supra* note 53, 466 U.S. at 695 (stating that when examining prejudice, court "must consider the totality of the evidence before the judge or jury").

[61] *State v. Lotter*, 311 Neb. 878, 976 N.W.2d 721 (2022).

assistance of counsel is in a postconviction motion.[62] But as we explain next, when a defendant is represented by new counsel on direct appeal, the procedural posture of the case requires the defendant to raise, on direct appeal, any known or apparent claims of ineffective assistance.

### (i) Defendant Must Raise All Known or Apparent Claims of Ineffective Assistance

[34] When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must properly raise on direct appeal any issue of trial counsel's deficient performance which is either known to the defendant or is apparent from the record.[63] Any known or apparent issue of deficient performance not properly raised on direct appeal will be procedurally barred in a subsequent postconviction proceeding.[64]

### (ii) Defendant Must Specifically Assign and Specifically Argue Deficient Conduct

[35] In every appeal in Nebraska, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court.[65] Although claims of ineffective assistance of counsel are not, technically speaking, assignments of error by the trial court, our cases require such claims to be included in the separate "assignments of error" section of the brief and to be separately numbered and paragraphed.[66]

---

[62] See *State v. Reames*, 308 Neb. 361, 953 N.W.2d 807 (2021).

[63] See, e.g., *State v. Rupp*, 320 Neb. 502, 28 N.W.3d 74 (2025); *State v. Williams*, 259 Neb. 234, 600 N.W.2d 313 (2000).

[64] See *id*.

[65] E.g., *Kruger, supra* note 18.

[66] See, generally, *Rupp, supra* note 63; Neb. Ct. R. App. P. § 2-109(D)(1)(e) (rev. 2025).

[36] Although prevailing on a claim of ineffective assistance under *Strickland* requires proving both that counsel's performance was deficient and that the deficient performance actually prejudiced the defendant, a defendant seeking to raise a claim of ineffective assistance on direct appeal is not required to make specific allegations of prejudice.[67] However, anytime a defendant seeks to raise an ineffective assistance claim, whether on direct appeal or in a postconviction motion, the defendant must specifically assign and specifically argue the alleged deficient performance, and must do so with sufficient particularity.[68]

[37-39] To sufficiently allege deficient performance, the allegations must include a "description of the specific conduct alleged to constitute deficient performance."[69] The description of deficient performance must be particular enough to (1) allow an appellate court to determine whether the claim can be decided upon the trial record and (2) allow a district court reviewing a later postconviction motion to recognize whether the claim was raised on direct appeal.[70] To allege deficient conduct with specificity requires "more than generalities of inadequate preparation or failures to introduce beneficial evidence."[71] An allegation will be sufficiently specific "when it addresses a specific issue that does not require additional information to understand precisely what the assignment attacks."[72] Although the argument section of the brief should elaborate on the alleged deficiencies by discussing legal authority and its application to the trial record, the argument section should

---

[67] See *State v. Filholm*, 287 Neb. 763, 848 N.W.2d 571 (2014).

[68] *Id*. See, also, *Rupp, supra* note 63; *Kruger, supra* note 18.

[69] See *Rupp, supra* note 63, 320 Neb. at 523, 28 N.W.3d at 89.

[70] See *Rupp, supra* note 63.

[71] See *id.* at 524, 28 N.W.3d at 90.

[72] See *id*. at 518, 28 N.W.3d at 87.

not be used to set forth, for the first time, what the allegedly deficient conduct was.[73]

### (iii) Not All Ineffective Assistance of Counsel Claims Can Be Resolved on Direct Appeal

[40] The fact that a claim of ineffective assistance of counsel is properly raised on direct appeal does not mean it can be resolved on direct appeal.[74] The determining factor is whether all the facts necessary to the analysis are part of the appellate record.[75]

[41-43] An ineffective assistance of counsel claim will not be addressed on direct appeal if it requires examination of facts not contained in the record.[76] But if the record on direct appeal conclusively establishes both that trial counsel's performance was deficient and that the deficient performance prejudiced the defendant's defense, an appellate court can determine trial counsel was ineffective.[77] Conversely, if the record on direct appeal conclusively establishes either that trial counsel's performance was not deficient or that any deficient performance did not prejudice the defendant's defense, an appellate court can determine trial counsel was not ineffective.[78] However, if the record on direct appeal does not conclusively establish or refute a claim of ineffective assistance, then the issue cannot be resolved on direct appeal[79] and must be properly raised in a subsequent postconviction proceeding.[80]

---

[73] See *Rupp, supra* note 63.

[74] See, e.g., *Hagens, supra* note 54.

[75] See, e.g., *id*.; *Corral, supra* note 56.

[76] *Vazquez, supra* note 60.

[77] See *Kruger, supra* note 18.

[78] *Id*.

[79] See *id*.

[80] See *id*.

We now apply these principles to the four ineffective assistance claims asserted by Lopez on direct appeal.

### (c) Failure to Obtain Additional Evidence of September 24, 2023, Incident

Lopez assigns that his trial counsel was ineffective "in failing to obtain exculpatory evidence regarding the rec center incident."[81] This is a classic example of a broad, conclusory allegation that lacks the specificity required to raise a claim of ineffective assistance. The general reference to "exculpatory evidence" does not describe with any specificity the allegedly beneficial evidence counsel failed to obtain, and it is functionally no different than making a general statement that counsel failed to adequately investigate the charges.[82] Because this allegation is insufficiently specific to raise a claim of ineffective assistance of counsel, we will not address it further.

### (d) Advising Lopez Not to Testify at Trial

[44-46] Lopez next assigns and argues that trial counsel was deficient "in failing to adequately prepare [him] to testify and advising him not to testify"[83] at trial. A defendant has a fundamental constitutional right to testify, and the right to testify is personal to the defendant and cannot be waived by defense counsel's acting alone.[84] Defense counsel bears the primary responsibility for advising a defendant of his or her right to testify or not to testify, of the strategic implications of each choice, and that the choice is ultimately for the defendant to make.[85] Defense counsel's advice to waive the right to testify can present a valid claim of ineffective

---

[81] Brief for appellant at 35.

[82] See *Rupp, supra* note 63.

[83] Brief for appellant at 39.

[84] *State v. Lessley*, 312 Neb. 316, 978 N.W.2d 620 (2022).

[85] *Id.*

assistance of counsel in two instances: (1) if the defendant shows that counsel interfered with his or her freedom to decide to testify or (2) if counsel's tactical advice to waive the right was unreasonable.[86]

Here, Lopez argues that "trial counsel interfered with his freedom to decide to testify by failing to prepare him to testify."[87] And he argues that counsel's "tactical advice to waive the right to testify was not reasonable"[88] and that counsel told Lopez "he was not prepared [to testify] in any event."[89] Lopez also argues that counsel's deficient performance was prejudicial because, had Lopez been adequately prepared to testify, he could have offered testimony to support the objective reasonableness of his belief in the necessity of using deadly force, including testimony that "Dirks was raising what he believed to be a firearm"[90] when Lopez fired the shots.

We conclude that this allegation of deficient performance was alleged with sufficient particularity, but the record on direct appeal is insufficient to resolve it.[91]

### (e) Failure to Investigate DHHS Policy

Next, Lopez assigns that his trial counsel was deficient "in failing to adequately investigate DHHS policy."[92] This is another example of a broad conclusory allegation that lacks the specificity required to raise a claim of ineffective assistance. It fails to describe with any particularity what information

---

[86] *Id.*

[87] Brief for appellant at 39.

[88] *Id.* at 40.

[89] *Id.*

[90] *Id.*

[91] See, generally, *State v. Vazquez, supra* note 60; *State v. Hill*, 298 Neb. 675, 905 N.W.2d 668 (2018), *disapproved on other grounds, State v. Falcon*, 319 Neb. 911, 25 N.W.3d 462 (2025); *State v. Mora*, 298 Neb. 185, 903 N.W.2d 244 (2017).

[92] Brief for appellant at 41.

counsel allegedly failed to investigate regarding DHHS policy or how that information might have helped his defense. And although the argument section of his brief provides some of this information, we have been clear that the argument section should not be used to set forth, for the first time, what the allegedly deficient conduct was. [93] This assignment was not sufficiently alleged, and it will not be further discussed.

### (f) Failure to Retain Expert to Rebut Claim of Paranoia

Lopez' final claim is that his counsel performed deficiently "in failing to retain an expert to rebut the State's claim that [Lopez] was suffering from self-induced paranoia." [94] Although this claim of ineffective assistance was sufficiently assigned and sufficiently argued, we conclude it is affirmatively refuted by the record.

As noted, the State's theory of the case was that the shooting was motivated by Lopez' "self-induced paranoia" over public reaction to events at the rec center several days earlier, causing him to develop an irrational fear that people wanted to kill him. Lopez argues that if trial counsel had retained an expert to evaluate his mental health, the expert would have opined that he "was not suffering from a mental health disorder, such as Paranoid Personality Disorder," which would have allowed Lopez to argue that "his fear and actions on September 26, 2023, were rational and reasonable under the circumstances." [95] Lopez asserts that such expert testimony would have changed the court's determination on "whether to give a self-defense or defense of others jury instruction." [96] We disagree.

---

[93] See *Rupp, supra* note 63.

[94] Brief for appellant at 42.

[95] *Id*. at 44.

[96] *Id*.

The legal question of whether the evidence was sufficient to state a cognizable justification claim did not turn on whether Lopez was, or was not, suffering from a paranoia disorder. Instead, it turned on a failure to adduce any evidence supporting a reasonable and good faith belief in the necessity to use deadly force under the circumstances. That legal conclusion would not change even if Lopez offered an expert opinion that he was not suffering from a paranoia disorder when he fired the shots.

Because Lopez cannot show prejudice resulting from trial counsel's alleged deficient conduct in failing to obtain an expert opinion on paranoia, this claim of ineffective assistance is affirmatively refuted by the record.

## V. CONCLUSION

For the foregoing reasons, the district court did not err in refusing to instruct the jury on self-defense or defense of others, and it did not impose excessive sentences. We therefore affirm Lopez' convictions and sentences.

Regarding the four claims of ineffective assistance of counsel Lopez raises on appeal, one claim was affirmatively refuted by the record, two claims were insufficiently alleged, and the remaining claim was sufficiently alleged but cannot be resolved on the appellate record.

AFFIRMED.

MILLER-LERMAN, J., not participating in the decision.